## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Altair Nanotechnologies Securities Litigation | Case No.: 1:14-cv-07828-AT<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Fu Guantong, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts and information and belief as to all other matters, based upon the investigation conducted by and through his attorneys. This investigation included, without limitation, the following: a review of the defendants' public documents; conference calls and announcements made by defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Altair Nanotechnologies, Inc. ("Altair" or the "Company"); analysts' reports and advisories about the Company; and information readily obtainable from public sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired Altair Nanotechnologies Inc. ("Altair" or the "Company") common stock ("Common Stock") traded on the NASDAQ Capital Market ("NASDAQ") between May 15, 2013 and September 25, 2014, both dates inclusive (the "Class Period").   Plaintiff seeks to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.     Altair designs, manufactures, and delivers energy-storage systems for clean and efficient power and energy management.  The Company purports to offer commercial solutions enabling the modernization of the electricity grid, utility-scale renewable power integration, and applications supporting remote, uninterruptible power-supply requirements for military and transportation applications.

3.     In July 2011, Canon Investment Holdings Limited ("Canon"), through its indirect subsidiary Energy Storage (China), acquired a majority interest in Altair, representing 53% of the outstanding shares. Defendant Yincang Wei is Canon's chairman, he "controls approximately 53% of the Company's shares[,]" and he has served as chairman of Altair's Board of Directors ("Altair Board") and a member of Altair's Compensation, Governance and Nominating Committee.

4.     In 2012, the Company launched operations in China and announced in regulatory filings that it expected to migrate significant amounts of its sales and manufacturing to China. For this purpose, the Company formed Altair Nanotechnologies (China) Co., Ltd. ("Altair China") in China, which in turn formed a wholly owned subsidiary, Northern Altair

Nanotechnologies Co., Ltd. ("Northern Altair"), which would serve as the prospective manufacturing entity. Altair pursued an economic development deal in China, and in April 2012, it entered into an agreement with the cities of Wu'an and Handan, which are both located in Hebei Province in China. In 2013, the Company determined to significantly expand its operations in China and, as a result, by the end of 2013, the Company had become an entity operating primarily in China.

5.      As further detailed herein, the Company's internal controls crumbled under the leadership of Defendant Wei and his representatives, as Altair morphed into a different company. The Company also experienced grave communication breakdowns between its Chinese and American businesses, was unable to maintain the minimum controls to ensure adequate financial reporting, and experienced an exodus of senior executives.

6.      As a result, throughout the Class Period, Defendants made materially false and misleading statements regarding the Altair's business and operations, as well as its internal controls over financial reporting. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in its statements for the three- and nine-month periods ended September 30, 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 and 2014 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and internal controls over the 2013 year-end financial close and reporting

process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, knew, or recklessly disregarded, the material misstatements that were identified by Crowe Horwath LLP ("Crowe"), the Company's former independent registered accounting, during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company was unable to generate complete or accurate financial statements during the Class Period.

7.      In fact, Altair has failed to file its audited annual financial statements for the fiscal years ended December 31, 2013 and December 31, 2014 because of admitted internal-control issues and material weaknesses. Moreover, the last financial statements that Altair did file, for the Company's nine-month period ending September 30, 2013, were unreliable, as the Company has admitted.  Investors have received no reliable financial or operational information about the Company subsequent to the filing of Altair's financial statements for the fiscal year ended December 31, 2012.

8.      The Company also experienced a string of executive and other resignations including: (i) its senior executives leaving in droves, (ii) one of its directors resigning, and (iii) its auditor's abrupt resignation.  For example, Defendant Paula Conroy served as Altair's CFO from her appointment on September 26, 2013 until her "resignation" as CFO on January 13, 2014.  Plaintiff's investigation revealed that she was fired abruptly after telling the Altair Board that the Company was insolvent.

9.      On March 26, 2014, the Company revealed that director Eqbal Al Yousuf ("Al Yousuf") had abruptly resigned from the Altair Board and its Audit Committee ("Audit

Committee"). Al Yousuf's resignation was accompanied by a scathing March 20, 2014 letter in which he detailed the Company's dysfunctional state.

10.     On September 4, 2014, the Company suddenly announced that on August 28, 2014, Crowe resigned as the Company's independent registered public-accounting firm. According to the Form 8-K ("September 4, 2014 Form 8-K"), Crowe's resignation letter to the Company's management and the Audit Committee of the Altair Board advised the Company that it was resigning due to its inability to complete the audit of the Company's financial statements for the year ended 2013, in part due to its inability to perform sufficient procedures to determine the completeness of reporting of subsequent-events transactions that may have occurred in China.

11.     Moreover, Crowe said that it was resigning in part due to the Company's material weakness relative to implementing controls and procedures to ensure accurate and timely communications between the Company's subsidiaries in China and its U.S.-based accounting team. Crowe also stated that it had identified for the Company several material weaknesses, which the Company had never corrected. According to the September 4, 2014 Form 8-K, the letter to management and the Audit Committee of the Altair Board identified the following material weaknesses:

- The Company experienced significant executive management and accounting level turnover in 2013 which led to a lack of segregation of duties throughout the Company and resulted in a lack of controls to perform a timely review of transactions at an appropriate level of precision;

- The Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements;

- The Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a

result, did not detect the material misstatements that were identified by Crowe during its audit process;

- The Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China, and as a result, led to material misstatements that were identified by Crowe during its audit process;

- The Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

12. As a result of this disclosure, NASDAQ halted trading in Altair Common Stock during the trading day on September 4, 2014 at $4.30 per share.

13. Shares of Altair Common Stock resumed trading on September 24, 2014, and as a result of this news, immediately fell $3.35 per share, a drop of nearly 78% from the halted price of $4.30 on September 4, 2014, to close at $0.95 on September 24, 2014.

14. On March 13, 2015, Altair filed a Form 8-K with the SEC admitting that it had investigated the deficiencies that Crowe raised in its letter and had determined that the financial statements for the three- and nine-month periods ended September 30, 2013, as presented on the Company's Form 10-Q that was filed with the SEC on November 19, 2013, should no longer be relied upon.

15. Overall, in response to these disclosures during the Class Period, the price of Altair Common Stock plummeted over an aggregate 90%, from a closing of $7.99 on October 14, 2013 to a closing of $0.75 on September 25, 2014.

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

19.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a substantial part of the conduct complained of herein, and the subsequent damages, occurred in this District.

20.    In connection with the acts, conduct, and other wrongs alleged in this Amended Complaint for Violations of the Federal Securities Laws, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

21.    Lead Plaintiff Fu Guantong ("Plaintiff"), as set forth in the certification accompanying his Motion for Appointment as Lead Plaintiff and Approval of Counsel filed on November 25, 2014, which is incorporated by reference herein, acquired Altair Common Stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.    Additional named plaintiff, David Helfenbein, as set forth in the certification accompanying the Complaint for Violation of the Federal Securities Laws filed on September 26, 2014, which is incorporated by reference herein, acquired Altair Common Stock at artificially

7

inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23.     Defendant Altair develops, manufactures, and sells nano-lithium-titanate batteries and energy-storage systems.  Altair Common Stock was traded on the NASDAQ under the symbol "ALTI."

24.     Defendant Alexander Lee ("A. Lee") served as Altair's Chief Executive Officer ("CEO") until his resignation as CEO on August 26, 2013.

25.     Defendant Richard W. Lee ("R. Lee") served as Altair's CEO from his appointment on August 26, 2013 until his resignation as CEO on February 21, 2014.

26.     Defendant Guohua Sun ("Sun") served as Altair's Interim CEO from his appointment on March 18, 2014 until his resignation as Interim CEO on August 13, 2014.

27.     Defendant James T. Zhan ("Zhan") served as Altair's CEO from his appointment on August 15, 2014 through the end of the Class Period.  Defendant Zhan was also appointed to a director on Altair's Board of Directors ("Altair's Board") on September 12, 2014.

28.     Defendant Stephen B. Huang ("Huang") served as Altair's Chief Financial Officer ("CFO") until his resignation as CFO on September 26, 2013.

29.     Defendant Paula Conroy ("Conroy") served as Altair's CFO from her appointment on September 26, 2013 until her resignation as CFO on January 13, 2014.

30.     Defendant Karen Werner ("Werner") served as Altair's Interim CFO from her appointment on March 18, 2014 through the end of the Class Period.

31.     Defendant Yincang Wei ("Wei") has been a director and chairman of the Altair Board since July 22, 2011.  He has been a member of the Compensation, Governance, and Nominating Committee.  He is also the Chairman of Canon Investment Holdings Limited

("Canon"), which is the majority owner of Altair. Altair disclosed that he "controls approximately 53% of the Company's shares."

32.     The defendants referenced above in ¶¶ 29 - 37 are sometimes referred to herein as the "Individual Defendants."

33.     Defendant Altair and the Individual Defendants are referred to herein, collectively, as the "Defendants."

### SUBSTANTIVE ALLEGATIONS

### Altair

34.     Altair is a Delaware corporation.  According to Altair's Form 10-K filed with the SEC on April 2, 2013 for the fiscal year ended December 31, 2012 ("2012 Form 10-K"), which was the last Form 10-K that the Company filed, its principal assets and operations were in the United States.

35.     Altair develops, manufactures, and sells nano-lithium-titanate batteries and energy-storage systems.  The Company's nano-lithium-titanate-battery systems purport to offer higher power density, longer cycle life, rapid charge and discharge capabilities, a wider operating-temperature range, and higher levels of safety than conventional lithium-ion batteries.

36.     According to Altair, large cities, counties, and transit authorities are increasingly turning to electric and hybrid-electric buses to reduce pollution and reliance on diesel fuel for their transportation systems, especially in markets such as China where there is significant pollution.  As a result, the Company is attempting to establish nano-lithium-titanate batteries as the power source of choice in these emerging markets.  Given the projected growth of electric buses in the Asia Pacific region, the Company views China as one of the largest market opportunities within the transportation segment.

37.     According to Altair's 2012 Form 10-K, Altair began looking at additional opportunities to expand the application of its battery technology into various industrial markets that had a need for the attributes of its battery technology.  Altair disclosed that it believed that in the aggregate, its target markets were multi-billion-dollar emerging markets with room for a number of successful suppliers.  Altair disclosed that it perceived no dominant provider and believed that the Company had a reasonable chance of becoming one of the successful suppliers as a result of its significant differentiated product attributes, the overall strength of its management team, and the recognition that the Company was receiving in the marketplace. Altair boasted that its proprietary technology platform gave its products many unique, highly sought-after attributes that clearly differentiated its products from their alternatives.  Included in these attributes were substantially longer cycle and calendar lives, a rapid recharge time, the ability to provide instantaneous high power, a wide operating-temperature range, and increased operational safety.

### Altair Morphs From a U.S. Company Into a Chinese Company; Trouble Ensues

38.     In July 2011, Canon, through its indirect subsidiary Energy Storage (China), acquired 37,036,807 shares of Altair Common Stock, representing 53% of the outstanding shares.  In 2012, Altair formed Altair China and Northern Altair to participate in the fast-growing China market.

39.     Defendant Wei is Canon's chairman, "controls approximately 53% of the Company's shares[,]" and has served as chairman of Altair's Board of Directors ("Altair Board") and a member of Altair's Compensation, Governance and Nominating Committee.

40.     After Canon acquired a majority stake of Altair, the Company descended into a state of chaos, including the following, without limitation: (i) grave communication breakdowns

between its Chinese and American businesses; (ii) the failure to maintain sufficient internal controls to generate accurate and reliable financial reporting in compliance with the U.S. federal securities laws; and (iii) the exodus of senior executives.

41.    As a result of these serious deficiencies, which were known or recklessly disregarded by the Defendants, Altair has failed to file its audited annual financial statements for the fiscal years ended December 31, 2013 and December 31, 2014 because of admitted internal-control issues and material weaknesses. In addition, the most recent financial statements that Altair *did* file – concerning the Company's nine-month period ending September 30, 2013 – have since been deemed unreliable by the Company.  Thus, since Altair's financial statements for the fiscal year ended December 31, 2012, the investing world has been given no reliable financial and operational information about the Company.

42.    Confidential former employees of Altair ("FE") confirm that Defendant Wei and his representatives engaged in unethical—and often illegal—business practices, prompting several Altair executives to leave the Company.  FE1 was Altair's former CFO prior to the Class Period and worked at Altair's headquarters in Reno, Nevada.[1]  According to FE1, "American laws to Wei were more like suggestions, rather than actual laws."

43.    FE2[2] stated that Defendant Wei and his representatives guided Altair's direction and "ruled with an iron fist," corroborating FE1.  FE2 stated that Defendant Wei and his representatives were directly aware of Altair's financial-reporting problems.  FE2 stated that Altair's various CEOs knew about this control, had little power against it, and instead followed Defendant Wei's direction or faced termination.

---

[1] FE1 was responsible for all aspects of Altair's financial, information-technology, legal, and environmental health and safety functions.

[2] FE2 was a process engineer and ultimately a senior product engineer at Altair from June 2005 to March 2014.  FE2 reported to Altair's cell-engineering manager, who reported to the director of cell and engineering development, who reported to the vice president of engineering and operations.

44.     FE1 and other Altair senior executives very clearly alerted the Altair Board, the Company's auditors, and the Company's outside legal counsel about Defendant Wei and his representatives' unethical business practices around July 2011, when Canon was in the process of acquiring majority ownership of Altair.  FE1 stated that conflicts arose quickly between Altair's senior executives and Defendant Wei and his representatives because Defendant Wei asked for things to be done unethically—and often even illegally.  The conflict escalated to the point that FE1 and other Altair senior executives told Altair's Board that they were against Canon acquiring majority ownership of Altair.

45.     FE2 stated that almost immediately after Canon's acquisition of majority ownership of Altair, communications between Altair's Chinese and American businesses were ineffective and problematic.  FE2 stated that there were two central problems: non-communication on key events from the Chinese business to the American business; and intentional miscommunication by the Chinese-based executives to the U.S.-based executives.  FE2 said that "they had no idea how to run a publicly traded U.S. company. … It was as bad as it could get. … It's more of a case of that the left hand doesn't know what the right hand is doing. … Chairman Wei drove everything."

46.     To illustrate, FE2 explained that before Canon acquired majority ownership of Altair, Altair consistently disclosed press releases to announce significant events.  After Canon acquired majority ownership of Altair, the public announcements decreased sharply.

47.     Canon, Defendant Wei, and his representatives' control and the deteriorating communication within Altair took a grave toll on the Company's financial reporting.  FE1 stated that before Canon acquired majority ownership of Altair and before Defendant Wei and his representatives took control, Altair's financial reporting was always filed on time—except for

one filing that was a day late.  But FE1 stated that afterwards, Defendant Wei "was bringing in people who had no experience in U.S. public companies and probably had no idea what they were supposed to do."

48.     FE3 corroborated this.  FE3 worked as an executive assistant at Altair prior to the Class Period.  FE3 reported to four Altair CEOs.  FE3 also performed administrative tasks for Altair's former CFOs, including Defendant Huang.  FE3 stated that Altair's financial team was in turmoil when she left Altair in July 2012, including not having enough money to pay its expenses:  "Altair was failing as far as finances."  FE3 stated that some of the frustration with the financial team stemmed from the China-based executives' direction, which did not seem to align with standard U.S. reporting procedures.

49.     FE4 corroborated this.[3]  FE4 stated that in 2013, Altair was struggling financially. There were a series of layoffs. Suppliers were contacting Altair's engineering department to ask why they were not getting paid.

50.     Once Canon became Altair's majority shareholder and Defendant Wei and his representatives took control, FE1 and a former Altair CEO met and had numerous discussions with Altair's auditors at the time to express their concern over how Defendant Wei and his representatives wanted things to be done at Altair.  FE1 stated that Defendant Wei and representatives wanted FE1 to engage in unethical financial practices, reflecting no concern for Altair's minority shareholders.  During meetings with the auditor, FE1 showed them emails reflecting Defendant Wei's unethical requests.

51.     FE5 corroborated the lack of financial controls at Altair.[4]  FE5 was responsible for forecasts, financial planning, and analysis.  FE5 reported to two prior Altair CFOs, including

---

[3] FE4 worked as an engineer and then a senior-systems integration engineer at Altair throughout the Class Period until September 2013.  FE4's responsibilities included working on energy storage for grid systems.

Defendant Huang.  FE5 stated that Defendant Huang was the main Altair contact for Crowe.

According to FE5, Defendant Huang was "in over his head."

52.     FE5 stated that there were several trust issues between Altair's U.S.-based and

China-based executives.  Altair was controlled through a relatively unknown Chinese entity and

figure.  Communications problems existed at an operational level.  FE5 stated that Altair

management was concerned about how Chinese management was running Altair:  "It was easy to

question the motive, the viability of the business and the ethical nature of what they were doing.

…  There were a lot of questions and people had a lot of discomfort.  …  It was a constant tug

and pull.  …  There are these Chinese investors who have a pretty good idea of what they want

to get done but they don't realize they bought a public company and we can do this and we can't

do that."

53.     In particular, FE5 stated that Altair's China-based executives did not understand

the importance or structures of U.S. financial regulations and reporting, which led to

communications problems and frustration within Altair.  For example, FE5 said that if Altair

wanted to downsize its staff, the Company was unaware of the reporting steps to ensure that the

process was handled correctly.

54.     And FE6, an accounts payable clerk at Altair from February 2012 to April 2013,

corroborated Altair's lack of financial controls.  FE6 worked under Altair's former controller,

who reported directly to Defendant Huang, Altair's former CFO.  FE6 was responsible for

paying the company's bills, which involved cutting checks and making wire transfers.  FE6

stated that Altair management was ineffective, and that supervisors did not seem to have the

necessary expertise and financial knowledge to do their jobs.  According to FE6, it was well

---

[4] FE5 worked as a director of financial planning and development prior to the Class Period—FE5 left Altair in August 2012.

known amongst Altair's employees that the Company was in serious financial trouble.  FE6 stated that his team was understaffed and sometimes had to wait days to complete a batch of payments.  There was consistent turnover and layoffs:  "People would come in there on a Monday and turn in their resignation on Wednesday. … It was just a bad culture."

55.     FE1 stated that it was clear that Canon, Defendant Wei, and his representatives were "not ethical, not appropriate, and not legal."  FE1 stated that an Altair former CEO and president, former vice president of operations, and former vice president of marketing all received several unethical requests from Defendant Wei and his representatives.  He also stated that concerns over these requests were elevated to the Altair Board.

56.     FE3 corroborated that that once Canon acquired majority ownership of Altair, the Company's whole culture changed.  Altair's U.S.-based employees faced difficulties working with the Chinese-based employees, who did not grasp U.S. standards and reporting practices. FE3 stated that Altair became very tight-lipped.

57.      FE2 stated that former Altair CEO H. Frank Gibbard ("Gibbard"), who served as Altair's CEO from September 2011 through April 2012, fired Defendant Huang, Altair's former CFO, for having potentially acted unethically.  But Defendant Wei quickly reinstated Defendant Huang.  This increased the tension between the Company's senior executives and Altair's Board.  Soon afterwards, Defendant Wei fired Gibbard.  FE2 stated that it "appeared [Gibbard] was trying to do the right thing but was being railroaded by the board."

58.     FE3 corroborated the circumstances surrounding Gibbard's termination.  In particular, FE3 stated that Gibbard quickly became uncomfortable with the decisions that the China-based executives were making for Altair.  FE3 explained an example of a closed-door meeting in late 2011 or early 2012, when FE3 heard Gibbard yell "I will not do that" at other

Altair executives during a meeting.  FE3 stated that it was not long after this meeting that Gibbard was terminated and Altair appointed Defendant A. Lee. Defendant A. Lee became Altair's CEO after Gibbard was fired, and Defendant A. Lee had worked closely with Defendant Wei on the Altair Board.  After Defendant A. Lee resigned as Altair's CEO, Defendant R. Lee was hired.

59.     FE3 stating that Altair employees were surprised to learn that Defendant A. Lee became Altair's CEO because of his background and lack of leadership experience.  FE3 stated that during Defendant A. Lee's tenure on the Altair Board, he was not involved in initiating many key decisions, and Altair employees felt that he was not an active director.

60.     FE2 stated that Defendant R. Lee told Altair employees himself that he was not qualified for the position, and Altair employees understood that Defendant R. Lee felt helpless because he could not make decisions that did not align with Defendant Wei.  FE2 explained that in one meeting with the Altair's executives, Defendant R. Lee told the group that he did not have the expertise for the position.  FE2 stated that Defendant R. Lee "would say, 'I'll try to talk to Chairman Wei but it's his company. He paid for it.'"  FE2 did not believe that Defendant R. Lee understood that Altair's officers could be held liable for the Company's decisions.

61.     FE2 stated that Defendant Conroy, Altair's former CFO, was fired after telling the Altair Board that the Company was insolvent.  FE2 stated that Defendant Conroy took a closer look at the Company's financials and quickly realized that they were a mess:  "She looked through the Company's financials and said you need to close this company down. … She said we were insolvent."  FE2 stated that the Altair Board abruptly fired Defendant Conroy after this presentation.  FE7[5] corroborated this by stating that it was rumored within Altair that Defendant

---

[5] FE7 worked as an engineer at Altair in Anderson, Indiana throughout the Class Period until April 2014.

Conroy was asked to do something "un-towards" or "perceived as unethical" by Altair's Chinese-based executives. Defendant Conroy refused and was promptly terminated.

62.     FE2 stated that Defendant Werner was appointed as interim CFO but may have lacked appropriate skills or training. FE2 stated that once Defendant Conroy was fired, Altair decided not to search for a replacement and instead hired from within, appointing Defendant Werner. FE2 and other employees believed that Defendant Werner was chosen because the Altair Board wanted a CFO who would follow direction without asking questions.

### *Exodus of Altair's Senior Executives and Directors*

63.     After Canon, Defendant Wei, and his representatives took control of Altair, an extraordinary number of its key executives and directors left the Company during the Class Period.

64.     On June 6, 2013, Altair disclosed that Vice President of Sales of Northern Altair 31, 2013, Jun (Eddie) Liu, had been terminated. Mr. Liu then continued to serve as a director of the Company.

65.     On August 30, 2013, Altair revealed that Defendant A. Lee resigned as the Company's CEO, and he had been replaced by the Board with Defendant R. Lee.

66.     On October 2, 2013, Altair disclosed the resignations of (Albert) Zou, Victor Sze, and Hong Guo as directors of the Company. Mr. Zou also resigned as President of the Company and from positions with its subsidiaries. The Altair Board also terminated the status of Defendant Huang as the Company's CFO. Defendant Huang was expected to remain an employee for a short period to facilitate the transition to a new CFO. Also on the same day, the Altair Board appointed each of Al Yousuf, Yuhong Li ("Li"), and Guohua (Andy) Wei as directors of the Company. Each of Al Yousuf and Li were also appointed to the Audit

Committee.  Altair disclosed that Guohua (Andy) Wei was also appointed as the legal representative and executive director of the Company's indirect subsidiaries in China and that he was Defendant Wei's nephew.  Altair then disclosed that Defendant Wei "is Chairman of the Board of Directors and also controls approximately 53% of the Company's shares."

67.     On October 29, 2013, Altair disclosed that Defendant A. Lee had resigned as a director of the Altair Board.

68.     On January 17, 2014, Altair revealed that Defendant Conroy had "resigned" as the Company's CFO and from positions with the Company's subsidiaries.  As detailed above, however, FE2 and FE7 stated that she was in fact terminated for informing Altair's management that the Company was insolvent.

69.     On February 20, 2014, Altair disclosed that on February 16, 2014, the Altair Board received Defendant R. Lee's letter of resignation as the Company's CEO and director and from positions with its subsidiaries.

70.     On August 19, 2014, Altair disclosed that Defendant Sun had resigned as the Company's interim CEO.  Defendant Sun would continue to serve as an Altair director and as an executive of Zhuhai Yintong Energy Company Ltd. and other entities under common control with the Company's majority shareholder, Canon.

### *An Altair Director Reveals the Company's Knowledge of Fraud*

71.     On March 26, 2014, the Company filed a Form 8-K with the SEC ("3/26/14 Form 8-K") announcing that director Al Yousuf resigned from the Altair Board and its Audit Committee, effective March 20, 2014.  Al Yousuf was an Altair director since September 2013.  Yousef detailed the reasons for his departure in his scathing resignation letter dated March 20, 2014, sent to the Altair Board, and attached to the 3/26/14 Form 8-K.

72.     Al Yousuf revealed that Altair—well into the Class Period— had been "flying totally blind for too long," and that the Company was rife with pervasive deficiencies including an inability to timely, completely, and accurately disclose Altair's material transactions in China; and a debilitating lack of cohesion and communication between its Chinese and American operations.  His letter stated as follows:

> To My Fellow Directors and the Chairman of the Board:
>
> Altair Nanotechnologies Inc. ("Altair US") is at a very critical stage in its history and *its very existence is at risk*[6]. During a period like this one, it is absolutely critical that we work together to solve our problems but we have failed to do so. *In recent months, our board has ceased to function effectively and I have lost confidence in our Chairman's ability to oversee this board in the best interests of the company and its stakeholders (including our employees, shareholders, customers and certainly more so than ever, our creditors). I am also concerned that a subset of the board has been speaking on behalf of the full board, that the rest of the board has not been properly informed and has not been given an opportunity to express its views, nor is even included in deliberations about material developments affecting the Altair US group at large*.
>
> Directors need to hear from one another in an open forum so all issues can be aired in a transparent fashion. Directors must put personal relationships and issues aside that might color their decision-making process. The board must be led by a Chairman who is unbiased, and focused only on what is best for the corporation. *A properly functioning board needs to be fully informed about all material facts about a corporation in order to make deliberate and intelligent decisions. Extreme candor among directors is critical. This board has failed to achieve this goal*.
>
> *My repeated efforts to rectify this perilous course have been unheeded*. Accordingly, I have no choice but to tender my resignation from the board of Altair US, effective immediately. Admittedly, it is for me an extraordinary step to tender my resignation, but you should understand that I am doing so as a last resort opportunity to voice my concerns over the direction of Altair US.
>
> I am concerned that since the resignation of Richard Lee was announced to the market earlier this year, on February 16, the office of chief executive officer has been left vacant and no apparent efforts (at least any efforts that I have been associated with) to find a viable replacement have been undertaken since then.

---

[6] Throughout this Amended Complaint for Violations of the Federal Securities Laws, emphasis is added unless stated otherwise.

Paula Conroy, our former Chief Financial Officer, also resigned earlier this year and the circumstances of her departure are still unclear to me. It appears to me that a lot of other qualified people have been terminated or have left the company.

I learned early this morning that the board had decided to appoint Guohua Sun and Karen Werner as Interim Chief Executive Officer and Interim Chief Financial Officer, respectively. I understand that this decision was taken at an emergency board meeting which took place yesterday. Even though I was invited to participate in the meeting - which took place via teleconference - , I was not able to join the debates as the meeting codes provided to me did not appear to be working (it is not the first time that this happens to me). Also, I was not provided with any background information regarding Mr. Sun and Ms. Werner and I am not aware of whether the board fully considered such candidates based on their merits and past experience in our industry. I also learned that Mr. Sun is an employee of our main shareholder and I therefore hope that the appointment process was not tainted by personal relationships. As for many other important issues affecting the future of our company, I sincerely wish that the process would have been more open, transparent and based on a fully considered process taking the company's best interests into consideration. Did the board interview several candidates for such jobs, taking into account their respective merits and suitability for the positions? I suspect in light of the suddenness of the appointments and the fact that the board meeting deciding on their appointments did not last more than 12 minutes, that it was not the case. I would therefore request that Mr. Sun's and Mrs. Werner's tenures be reevaluated. *We have been flying totally blind for too long, I am afraid*. New officers, qualified for the job and effectively empowered by the board, need to be appointed as soon as possible. A search for the most suitable candidates for such jobs needs to be undertaken without further delays.

*I am concerned that material information regarding our Chinese operations is not properly shared with the board and that important decisions affecting the Altair US group as a whole are taken at the level of our Chinese affiliates, without consultation of this board. A recent example of this are the loans granted by the Bank of China and the Wu'an Rural Credit Cooperative Co, Limited in October, last year for amounts of approximately $3.8MM and US $17MM, respectively. These are material developments but I only learned about them when stumbling upon the press release filed by the company. This was not discussed during any of our board deliberations. Corporate governance principles need to extend throughout the Altair US group but unfortunately they do not. Our Chinese operations are a total "black box" for certain members of this board, including me*.

The implementation of the relocation of our manufacturing facilities to Wu'an in China is far exceeding the plans that were originally presented to the board. Employees at our Anderson facility are worried about their future and are resigning in droves. We cannot afford to let our intellectual capital walk out of the door - this board should communicate to the employees to inform them with

specificity about their future within the group. Our US customers are reluctant to order from us. They need to be reassured about the continuity of our supply chain. I understand that one of the Company's largest customers in the US recently voiced his concerns about our ability to deliver on a large order. We need to take a very hard look at the image we are projecting. I am also very concerned about the budgeting process in respect of the relocation of our manufacturing to China. The costs associated with such relocation have not been fully disclosed to the board and appear to be creeping up.

I have decided to resign because I thought it was the right thing to do as a fiduciary for the Company and its stakeholders. Sometimes a board member being disruptive is exactly what a Company and board needs at a critical time.

The situation can be fixed, but time is of the essence.

Sincerely,

/s/ Eqbal Al Yousuf

***Crowe Reveals Fraud at Altair***

73.    In addition to Al-Yousuf's revelations, Altair's former auditor Crowe revealed additional facts underlying Altair's fraudulent disclosures.

74.    On September 4, 2014, Altair announced in a Form 8-K with the SEC ("9/4/14 Form 8-K") that Crowe had resigned as the Company's independent registered public-accounting firm.

75.    According to Altair, Crowe's resignation letter to the Company's management and the Audit Committee stated that Crowe was resigning because it was unable to complete its audit and issue an audit report for the year ended December 31, 2013 due to material weaknesses in the Company's controls and procedures.

76.    Altair admitted that in 2013, "the Company determined to significantly expand its operations in China and, as a result, by the end of 2013, the Company had become an entity operating primarily in China. In its resignation letter, Crowe advised the Company that it was resigning due to its inability to complete the audit of the Company's financial statements for the

year ended 2013 in part due its inability to perform sufficient procedures to determine the completeness of reporting of subsequent events transactions that may have occurred in China and in part due to the Company's material weakness relative to implementing controls and procedures to ensure accurate and timely communications between the Company's subsidiaries in China and its U.S.-based accounting team."

77.     Crowe's resignation letter to Altair's management and the Audit Committee identified several material weaknesses that the Company had not corrected:

- The Company experienced significant executive management and accounting level turnover in 2013 which led to a lack of segregation of duties throughout the Company and resulted in a lack of controls to perform a timely review of transactions at an appropriate level of precision.

- The Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements.

- The Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process.

- The Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China, and as a result, led to material misstatements that were identified by Crowe during its audit process.

- The Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

78.     Altair's 9/4/14 Form 8-K included Crowe's letter dated September 4, 2014 agreeing to the statements in the 9/4/14 Form 8-K.

79.     Thus, the Crowe letter corroborates the statements of the numerous confidential witnesses that described significant deficiencies in the Company's internal controls.

80.     Altair has failed to file its audited annual financial statements for the fiscal years ended December 31, 2013 and December 31, 2014 because of admitted internal-control issues and material weaknesses.   Indeed, the last financial statements that Altair disclosed to the investing world was the Company's nine-month period ending September 30, 2013.   But Altair has even admitted that those financial statements were unreliable.   Since Altair's financial statements for the fiscal year ended December 31, 2012, the investing world has been given no reliable financial and operational information about the Company.

*Altair Admits That Most of its Financial Statements for 2013 Were Materially Misstated.*

81.     After delisting Altair Common Stock from NASDAQ, on March 13, 2015, Altair filed a Form 8-K with the SEC ("3/13/15 Form 8-K") admitting that as "a result of the management team's work, on March 13, 2015, the Company determined that there exists factual support that such issues and weaknesses [that Crowe raised in its letter filed in the 9/4/14 Form 8-K] existed in 2013 and has therefore determined that the financial statements for the three and nine month periods ended September 30, 2013, as presented on the Company's Form 10-Q that was filed with the [SEC] on November 19, 2013, should no longer be relied upon."

82.     Altair admitted to the following:

Crowe Horwath LLP ("Crowe"), the former independent registered accounting firm of Altair Nanotechnologies Inc. (the "Company"), resigned from its position on August 28, 2014. Since the resignation, the Company has not been able to complete its audited annual financial statements for the fiscal years ending December 31, 2013 and December 31, 2014 (the "Missing Reports"). Mr. James Tao Zhan, the Company's Chief Executive Officer, has been leading the Company's management team in analyzing the internal control issues and material weaknesses identified by Crowe in Crowe's letter to the Company, which letter was disclosed in the Company's Current Report on Form 8-K that was filed with the Securities and Exchange Commission on September 4, 2014. As a result of the management team's work, on March 13, 2015, the Company determined that there exists factual support that such issues and weaknesses existed in 2013 and has therefore determined that the financial statements for the three and nine

month periods ended September 30, 2013, as presented on the Company's Form 10-Q that was filed with the Securities and Exchange Commission (the "SEC") on November 19, 2013, should no longer be relied upon.

In addition, the Company's management team has taken the following measures to ensure that the Missing Reports can be completed as soon as practicable:

1. The Company is searching for a new auditor with the necessary capabilities to undertake an audit of the Company's financial statements for the fiscal years ended December 31, 2013 and December 31, 2014;

2. The Company's management team is evaluating the suggestions made by Crowe in relation to rectification of internal controls so that, when engaged, a new auditor may complete the audit for the fiscal years ended December 31, 2013 and December 31, 2014 as soon as is practical; and

3. The Company's management team is continuing to investigate the internal control issues and material weaknesses identified by Crowe.

### Materially False and Misleading Statements Issued During the Period

83.     On May 15, 2013, the first day of the Class Period, Altair issued a press release and filed a Form 8-K with the SEC ("May 15, 2013 Form 8-K"), signed by Defendant Huang, announcing operating and financial results for the first quarter ended March 31, 2013.  Altair stated that it "reported revenues of $1.9 million for the first quarter compared to $0.3 million for the same period in 2012.  The gross loss was $0.3 million due to inventory cost adjustments and the launching of new electric-grid products.  Operating expenses were $3.2 million for the first quarter, a $1.6 million decrease from $4.8 million for the same period in 2012.  Planned reductions were achieved and accounted for the decrease of $1.6 million in the research and development, sales and marketing, and general and administrative departments.  The net loss for the first quarter of 2013 was $3.4 million ($0.29 per share) compared to a net loss of $4.9 million ($0.42 per share) for the same period in 2012."

84.     The statements referenced in ¶ 83 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's

business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

85.    Defendant A. Lee stated the following in the 5/15/13 Form 8-K about the Company's financial results:

> Our goal in 2012 was to advance our commercialization efforts, reduce cost and position the company for growth[.] … Thus far in 2013, we can tangibly point to our achievements in each of these areas. … We reduced our operating expenses this past quarter by 33% as compared to the same period last year. … With respect to the critical issue of revenue, we recognized $1.9 million in revenue this quarter, and now have $7.1 million in deferred revenue.

25

86.     The statements referenced in ¶ 85 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and even communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

87.     On May 15, 2013, the Company filed a Form 10-Q with the SEC ("Q1 Form 10-Q"), which was signed by Defendants A. Lee and Huang, reiterating Altair's quarterly financial results and financial position previously announced in the 5/15/13 Form 8-K.

88.    The statements referenced in ¶ 87 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

89.    The Q1 Form 10-Q contained the following language pertaining to the Company's expanding operations in China:

In 2012, we formed Altair Nanotechnologies (China) Co., Ltd. ("Altair China") and Northern Altair Nanotechnologies Co., Ltd. ("Northern Altair") in order to

aggregate key elements of our supply chain and expand into the Chinese market. We anticipate this expansion will allow us to participate in the fast-growing China market.

90.     The statements referenced in ¶ 89 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (2) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; and (3) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China.

91.     The Q1 Form 10-Q stated the following regarding the Company's internal control over financial reporting:

**Controls and Procedures**

(a)     Based on their evaluation as of March 31, 2013, which is the end of the period covered by this Quarterly Report on Form 10-Q, *our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act) are effective*, based upon an evaluation of those controls and procedures required by paragraph (b) of Rule 13a-15 or Rule 15d-15 of the Exchange.

(b)     There have been no changes in our internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Exchange Act Rules 13a-15 or 15d-15 that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

92.     The statements referenced in ¶ 91 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's

business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and internal controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and internal controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and internal controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and internal controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

93.     The Q1 Form 10-Q contained signed Rule 13a-14(a)/15d-14(a) certifications ("Rule 13a-14(a)/15d-14(a) Certifications"), pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), by Defendants A. Lee and Huang, stating, in pertinent part, as follows:

1.      I have reviewed this report on Form 10-Q of Altair Nanotechnologies Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.       The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and we have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

94.    The Q1 Form 10-Q also contained signed certifications under 18 U.S.C. Section 1350 ("Section 1350 Certifications"), pursuant to Section 906 of SOX, by Defendants A. Lee and Huang, stating, in pertinent part, as follows:

In connection with the Quarterly Report of Altair Nanotechnologies Inc. (the "Company") on Form 10-Q for the quarterly period ended March 31, 2013 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Alexander Lee, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

95.    The statements referenced in ¶¶ 93-94 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level

turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and internal controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and internal controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and internal controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

96.     On May 15, 2013, Altair hosted a conference call for investors and analysts to discuss the Company's first-quarter 2013 results ("3/15/13 Conference Call").   During the 3/15/13 Conference Call, Defendant A. Lee stated the following about the distribution of resources between the Company's Chinese and American operations:

> Many investors have asked me about the China plan and often think that, that plan is to replace the U.S. operations and so forth. Please make no mistake, the U.S. operation is critical to our success and I think the funding commitments that we've made as a company to the U.S. operations demonstrates that.
>
> Of course, we also took the opportunity last year to address some real challenges here in the U.S. Our historic spending was very high and we implemented measures to reduce costs across the board. We implemented measures to rightsize our organization in the U.S. and it's important to note that, irrespective of the China plan, we would have implemented these cost-reduction measures, simply put, because we had to.

*     *     *

> We have shown our commitment to the U.S. operation through this past year. As I
> mentioned earlier, over half of the Canon investment has already been allocated to
> fund the U.S. operations and that's a pretty meaningful statement.

97.     The statements referenced in ¶ 96 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (2) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; and (3) the Company did not implement adequate procedures and internal controls to ensure accurate and timely communication with its subsidiaries in China.

98.     During the March 15, 2013 Conference Call, Defendant A. Lee stated the following about the Altair's financial performance:

> Now with that foundation in place, we believe that 2013 will be a pivotal year.
> During the first quarter of this year, we had $1.9 million in revenue. In addition,
> we had approximately $7.0 million in deferred revenue on our books as of March
> 31, a meaningful portion of which we hope to recognize this year.
>
> *        *        *
>
> Turning to the cost side of things. During the first quarter of this year, we reduced
> our monthly operating expenses by 33% as compared to the same period last year.
> Our average monthly operating expense this first quarter was about $1 million
> versus $1.6 million per month during the same period last year.

99.     The statements referenced in ¶ 98 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's

33

financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and internal controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and internal controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and internal controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and internal controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

100.    During the March 15, 2013 Conference Call, Defendant Huang also stated the following about Altair's financial performance:

> For the first quarter ended March 31, 2013, revenues were $1.9 million compared to the first quarter of 2012 revenues of $257,000. Gross loss was $313,000 in the first quarter of 2013 compared to $163,000 in the first quarter of 2012.

> Operating expenses were $3.2 million in the first quarter of 2013 compared to $4.8 million for the same period in 2012. The net loss for the first quarter of 2013 was $3.4 million or $0.29 per share compared to a net loss of $4.9 million or $0.42 per share for the same period in 2012.

> The basic and diluted weighted average shares outstanding for the first quarter of 2013 remained constant at 11.6 million compared to the same period in 2012.

Revenues were increased by $1.6 million in the first quarter of 2013, primarily due to revenue recognized for the sale of 1 ALTI-ESS Advantage system sold to Vestas Wind Systems.

Gross loss was increased by $150,000 in the first quarter of 2013, primarily due to inventory cost adjustments and the launching of our new electric grid product.

Operating expenses were decreased by $1.6 million during the 3 months ending March 31, 2013, compared to the 3 months ending March 31, 2012. This decrease was primarily due to planned reductions achieved and accounted for in research and development, sales and marketing and general and administrative departments in the first quarter of 2013.

Net loss was decreased by $1.4 million in the first quarter of 2013, primarily due to overall decreases in operating expenses.

Altair's cash and cash equivalents decreased by $1.4 million from $12.4 million as of December 31, 2012, to $10.9 million as of March 31, 2013. The net decrease of $1.4 million resulted from the net loss of $3.4 million, mainly offset by a reduction in deferred contract costs of $1.7 million due to completing 2 projects.

Changes to cash included receipts related to closing 2 projects during the quarter for our ALTI-ESS Advantage product. The closed project included a completed contract with Vestas Wind Systems and a leased system to Energy Storage Systems. Altair received $2.7 million in customer receipts during the quarter ended March 31, 2013.

Our overall cash position, including restricted and long-term restricted classifications, was $28.8 million as of March 31, 2013.

101.    The statements referenced in ¶ 100 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level

35

turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

102.    During the 3/15/13 Conference Call, Defendant A. Lee evasively fielded questions from Robert Cousins, a private investor, about the shift in Altair's disclosure strategy of, in essence, being less transparent to the investing world.

103.    The statements referenced in ¶ 102 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level

36

turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

104.    On August 8, 2013, Altair issued a press release and filed a Form 8-K with the SEC ("8/8/13 Form 8-K"), signed by Defendant Huang, announcing operating and financial results for the second quarter ended June 30, 2013.  Altair stated that it "reported revenues of $3.2 million for the second quarter compared to $0.5 million for the same period in 2012.  The gross loss was $0.1 million, due to inventory cost adjustments and the launching of new electric grid products, compared to $0.6 million for the same period in 2012.  Operating expenses were $3.0 million for the second quarter, a $1.4 million decrease from $4.4 million for the same period in 2012.  Planned reductions were achieved and accounted for the decrease of $1.4 million in the research and development and sales and marketing departments. General and administrative costs increased due to the ramp up of the Company's China operations.  The net loss for the second quarter of 2013 was $3.0 million ($0.26 per share) compared to a net loss of $4.9 million ($0.42 per share) for the same period in 2012."

105.    The statements referenced in ¶ 104 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

106.    Moreover, Defendant A. Lee stated the following in the 8/8/13 Form 8-K about Altair's performance:

> Sixteen months ago, we put into action our plan to position the company for growth, reduce costs, and drive revenue opportunities[.]  … We focused heavily

on the execution of our deliverables to achieve these goals. Today, our teams in the U.S. and China act as one, and we are nearing the completion of our new nano lithium titanate and energy storage system plants on 106 acres that we acquired the land use rights for in Wu'an, China.

In addition, we have delivered multiple grid-scale systems to leading grid operators that have stated how impressed they are with our product's performance and that we can use as key references. We have reduced our operating expenses by 36% as compared to the quarter immediately preceding my start date back in April 2012, and we hit this target while ramping up our China team from just a few employees to a 78 person team. With respect to revenue, we recognized $3.2 million in revenue this quarter, which brings our mid-year revenue total to $5.0 million. We currently have $5.5 million in deferred revenue, and we are on track to have one of our best years on record. As we noted last quarter, 2013 will truly be a milestone year for Altair.

107.    The statements referenced in ¶ 106 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not

39

detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

108.    On August 9, 2013, Altair hosted a conference call for investors and analysts to discuss the Company's second-quarter 2013 results ("8/9/13 Conference Call").   During the 8/9/13 Conference Call, Defendant A. Lee stated the following about the cohesion between the Company's Chinese and American operations:

> Roughly 16 months ago, we put together a new business plan that will position the company for growth, reduce our costs and drive our revenue opportunities. As you know, we are focused heavily on the execution of our deliverables to achieve these goals.
>
> Today our teams in the U.S. and China act as one and we now have an economic development agreement with the Cites of Wu'an and Handan in China.
>
> *       *       *
>
> And lastly, as I mentioned before, things are continue to go well in China, there is no doubt that the China market can be quite complicated and difficult at times but we have a very good team out in China that understands that market. We have strong engagement with that team, with our investors and we continue to make a very rapid process – progress in that country. 16 months ago we didn't have any land, now we have 106 acres of land two buildings we're actually three buildings now and these plants are almost completed. So, that will help us address the product cost issues, it will help us address the supply chain issues. Previously we were shipping LTO from Reno, Nevada out to Asia to build the cell, the cell was coming back to the states. And at least we've taking one piece out of that in a lengthy supply chain and aggregated suppliers in such a way that it should help us with our lead times and ultimately with the cost as well.
>
> So, all in all, I think we continue to make steady progress. I'd like to thank to our team, our team has been working extremely hard in both the U.S. and China, none of this would be possible without them. And we've all been very, very focused on improving the performance of the company and I think the facts speak for themselves. There is steady improvement. And we're going in the right direction. So, I think that's good news for our team and certainly a lot of thanks for them.

109.    The statements referenced in ¶ 108 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (2) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; and (3) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China.

110.    During the 8/9/13 Conference Call, Defendant A. Lee stated the following about Altair's financial performance:

> Turning to the cost issue, we have now reduced our operating expenses by nearly 40% as compared to the quarter immediately preceding my first day at the company and we hit this target while we ramping up our China team from just a handful of employees 16 months ago to nearly 80 employees today. With respect to revenue, we have successfully delivered systems to customers that include the Hawaii Natural Energy Institute (inaudible) and ESH. In the process the performance has improved significantly.

> We recognized $3.2 million in revenue this quarter, which brings our midyear revenue total to about $5 million. Given that we currently have $5.5 million in deferred revenue I think one can quickly see that we are in track to have one of the best years in the record. 2013 should truly be a milestone year for Altair.

111.    The statements referenced in ¶ 110 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to

timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

112.    During the 8/9/13 Conference Call, Defendant Huang also stated the following about the Altair's financial performance:

> For the second quarter ended June 30, 2013, revenues were $3.2 million compared to the second quarter of 2012 revenues of $454,000. Gross loss was $61,000 in the second quarter of 2013 compared to $620,000 in the second quarter of 2012.

> Operating expenses were $3 million in the second quarter of 2013 compared to $4 million for the same period in 2012. The net loss for the second quarter of 2013 was $3 million or $0.26 per share compared to a net loss of $4.9 million or $0.42 per share for the same period in 2012.

> The basic and diluted weighted average share outstanding for the second quarter of 2013 remained constant at 11.6 million compared to the same period in 2012.

> Revenues were increased by $2.7 million in the second quarter of 2013, primarily due to the revenue recognized for the sale of one ALTI-ESS system sold to

Hawaiian Electric Light Company and Hawaii Natural Energy Institute for their Hawi Wind Farm on the Big Island of Hawaii.

Gross loss was decreased by $559,000 in the second quarter of 2013, primarily due to inventory cost adjustment and the launching of new electric grid products. Operating expenses were decreased by $1.4 million during the three months ending June 30, 2013, compared to the three months ending June 30, 2012. This decrease was primarily due to the planned reductions achieved and accounted for in research and development and sales and marketing departments, which offset with increases in general and administrative departments primarily due to the ramp up of our China operations in the second quarter of 2013. Net loss was decreased by $1.9 million in the second quarter of 2013, primarily due to overall decreases in operating expenses.

Altair's cash and cash equivalents decreased by $3.7 million from $12.4 million as of December 31, 2012, to $8.7 million as of June 30, 2013. The net decrease of $3.7 million resulted from the net decrease in operating activities of $4.2 million. The net decrease is investing activities of $1.6 million and the net increase in financing activities of $24 million.

The investing activities included the acquisition of the second land use right from the Government of Wu'an, China, which was paid for by using restricted cash, and the purchase of fixed assets by Northern Altair. The financing activity included the increase of deferred income due to receiving $1.9 million in cash incentives from the purchase of the first land use right.

Our overall cash position, including restricted and long-term restricted classifications was $17.8 million as of June 30, 2013. We had submitted an application for cash incentives from the Government of Wu'an amount approximately equal to the amount of the second land use and related taxes. And we expect to receive $8.6 million in cash incentives from the Government of Wu'an in the second half of 2013.

113.   The statements referenced in ¶ 112 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the

Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

114.    On August 14, 2013, the Company filed a Form 10-Q with the SEC ("8/14/13 Form 10-Q"), which was signed by Defendants A. Lee and Huang, reiterating Altair's quarterly financial results and financial position previously announced in the 8/8/13 Form 8-K.

115.    The statements referenced in ¶ 114 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the

Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

116.    The 8/14/13 Form 10-Q contained the following language pertaining to the Company's expanding operations in China:

> In 2012, we formed Altair Nanotechnologies (China) Co., Ltd. ("Altair China") and Northern Altair Nanotechnologies Co., Ltd. ("Northern Altair") in order to aggregate key elements of our supply chain and expand into the Chinese market. We anticipate this expansion will allow us to participate in the fast-growing China market.

117.    The statements referenced in ¶ 116 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was

unable to timely, completely, and accurately disclose Altair's material transactions in China; (2) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; and (3) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China.

118.    The 8/14/13 Form 10-Q stated that Altair's principal executive officer and principal financial officer have concluded that its disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act) were effective and that there had been no changes in the Company's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Exchange Act Rules 13a-15 or 15d-15, using language substantially similar to that used in the Q1 Form 10-Q, as reflected in ¶ 91 above.

119.    The statements referenced in ¶ 118 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its

financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

120.     The 8/14/13 Form 10-Q contained signed Rule 13a-14(a)/15d-14(a) Certifications by Defendants A. Lee and Huang, using language substantially similar to that used in the 5/15/13 Form 10-Q, as reflected in ¶ 93 above.

121.     The statements referenced in ¶ 120 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its

financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

122.    The 8/14/13 Form 10-Q contained signed Section 1350 Certifications by Defendants A. Lee and Huang, using language substantially similar to that used in the Q1 Form 10-Q, as reflected in ¶ 94 above.

123.    The statements referenced in ¶ 122 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 and 2014 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its

financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

124. On October 25, 2013, Altair filed its Form DEF 14A with the SEC, which was signed by Defendant R. Lee. Altair disclosed the following regarding its Code of Ethics and Code of Conduct:

> The Company has adopted the Code of Ethics for Senior Executives, Financial Officers, Members of the Management Executive Committee, and Directors (the "Code of Ethics"), which constitutes a code of ethics that applies to the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, as defined in Item 406 of Regulation S-K under the Exchange Act. The Code of Ethics is available on the Company's website at www.altairnano.com under "Investors" – "Governance."

> The Company has adopted the Altair Nanotechnologies Inc. Code of Conduct (the "Code of Conduct"), which constitutes a code of conduct applicable to all officers, directors and employees that complies with NASDAQ Rule 4350(n). The Code of Conduct is available on the Company's website at www.altairnano.com under "Investors" – "Governance."

125. The statements referenced in ¶ 124 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the

Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

126.    Altair's Code of Ethics stated, in pertinent part, as follows:

**Code of Ethics for Senior Executives, Financial Officers and Members of the Management Executive Committee**

**I. Purpose of Code of Ethics**

The purpose of the Code of Ethics is to promote the honest and ethical conduct of our Senior Executives and Financial Officers, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. To provide information that is accurate, complete, objective, relevant, accurate, timely and understandable disclosure in reports and documents required to be filed or submitted to governmental agencies or in public communications made by Altair Nanotechnologies Inc. (the "Company"), and to promote compliance with all applicable rules and regulations that apply to the Company and its officers.

**II. Reporting and Accountability**

The Audit Committee of the Board of Directors of the Company is responsible for applying this Code of Ethics to specific situations in which questions are

presented to it and has the authority to interpret this Code of Ethics in any particular situation. Any Senior Executive who becomes aware of any existing or potential breach of this Code of Ethics is required to notify the Audit Committee through the Chairman of the Audit Committee promptly.

The Audit Committee shall take all action it considers appropriate to investigate any breaches reported to it.

### III. Introduction

The Code of Ethics is applicable to the Company's chief executive officer, president, vice president, chief financial officer, corporate controller, and non-independent members of the board of directors (the "Senior Executives").

As senior members of the Company's management these individuals are an example for all other employees and are expected to foster a culture of transparency, integrity and honesty.

Waivers of this Code can only be made by the Board of Directors through recommendation of its Audit Committee and, in that event, shall be disclosed in accordance with applicable law.

*       *       *

### Accurate Periodic Reports and Other Public Communications

Securities Exchange Commission rules require full, fair, accurate, timely and understandable disclosure in our periodic reports and other public communications. The Company has established the following guidelines to ensure the quality of our periodic reports:

* All Company accounting records, as well as reports produced from those records, must be kept and presented in accordance with the laws of each applicable jurisdiction.

* All records must fairly and accurately reflect the transactions or occurrences to which they relate.

* All records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses.

* The Company's accounting records must not contain any false or intentionally misleading entries.

* No transactions may be intentionally misclassified as to accounts, departments or accounting periods or in any other manner.

* All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.

* Except as approved by the Audit Committee, no information may be concealed from the internal auditors or the independent auditors.

* Compliance with Generally Accepted Accounting Principles and the Company's system of internal accounting controls is required at all times.

### V. Compliance with Laws and Ethics Code

Senior Executives are expected to comply with both the letter and spirit of all applicable governmental rules and regulations and this Code, and to report any suspected violations of applicable governmental rules and regulations or this Code of Ethics to the Board of Directors through its Audit Committee or through the use of the Company's confidential and anonymous compliance procedure for reporting ethics violations (i.e. the Whistleblower Policy). Failure to comply with this Code of Ethics or any applicable laws or regulations may result in disciplinary action, up to and including immediate discharge without notice.

127.    Altair's Code of Conduct stated, in pertinent part, as follows:

In keeping with the best practices of corporate governance, the following is the Code of Conduct for Altair Nanotechnologies, Inc. and its consolidated direct and indirect subsidiaries (the "Company"). This Code of Conduct shall be signed and adhered to by all officers, directors and employees (each, an "employee") of the Company.

### 3.1 Compliance Standards

The Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO") are responsible for applying these policies to specific situations in which questions may arise and has the authority to interpret these policies in any particular situation. Any questions relating to how these policies should be interpreted or applied should be addressed to the CEO or the CFO.

An employee who is unsure of whether a situation violates this Code should discuss the situation with either the CEO or CFO, to prevent possible misunderstandings and embarrassment at a later date.

An employee who is aware of any questionable behavior should discuss the situation with the CEO or CFO to prevent possible misunderstandings and embarrassment at a later date.

Any employee who becomes aware of any existing or potential violation of laws, rules, regulations or this Code is required to notify the CEO or CFO promptly. Failure to do so is itself a violation of this Code. To encourage employees to

report any violations, the Company will not allow retaliation for reports made in good faith.

*       *       *

### 3.3 Compliance with Laws, Rules and Regulations

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations.

An employee who is unsure of whether a situation violates any applicable laws, rules or regulations should discuss the situation with either the CEO or CFO, to prevent possible misunderstandings and embarrassment at a later date.

Any violation of applicable laws, rules and regulations, including any conflict of interest that rises to such a level, will be dealt with swiftly by the Company and, to the extent required by law, promptly disclosed to the applicable law enforcement authorities.

*       *       *

### 3.4.3 Fair Dealing

The Company succeeds through honest business practices. The Company does not seek to gain advantages through illegal or unethical business practices. Each employee, officer and director should endeavor to deal fairly with the Company's customers, service providers, suppliers and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

*       *       *

### 3.4.5 Financial Reporting

Officers and employees in a position to do so will not intentionally cause the Company's records or financial reporting to contain errors or otherwise omit information required to fairly present the Company's financial information in accordance with its policies.

### 3.5 Waivers of this Code

From time to time, the Company may waive some provisions of this Code. Any employee, officer or director who believes that a waiver may be called for should contact either the CEO or the CFO. Any waiver of the Code for executive officers or directors of the Company may be made only by the Board of Directors, or a

53

committee of the Board of Directors, and, if by committee, must promptly be disclosed to all Directors. Waivers of this Code shall be disclosed to regulatory authorities or to the public to the extent required by governing law and listing requirements.

**3.6 Enforcement**

The Company intends to enforce the provisions of this Code in a consistent manner, regardless of the status of the employee at the Company. Enforcement by the Company shall commence promptly following notice to the Company of any violation or alleged violation of this Code. The CEO or the CFO shall be responsible for receiving such notices and for applying the provisions of this Code to situations that violate or potentially violate this Code.

An employee who is unsure of whether a situation violates this Code may discuss the situation with the CEO or the CFO to prevent possible misunderstandings and embarrassment at a later date. The responsibility of an employee to report any questionable behavior promptly to the CEO or the CFO is a clear and objective requirement. A failure to observe this requirement will itself be a violation of this Code. The Company wishes to encourage employees to report questionable behavior, and the Company will, therefore, not tolerate any retaliatory actions toward employees that have made reports in good faith. If any employee is concerned that reporting a violation of this Code to, or discussion a related situation with, the CEO or the CFO would involve a conflict of interest for either the CEO or the CFO or both, or if the CEO and the CFO are unavailable, the employee should contact the Chairman of the of the Audit Committee, directly or through the means identified in the Whistleblower Policy of the Company.

To determine whether a violation of this Code as occurred, an initial investigation will be made by or under the direction of the CEO or CFO, and the result of such investigation shall be presented in a written report to the Chairman of the Audit Committee. If deemed necessary, the CEO or the CFO shall conduct interviews with all employees possessing relevant information. The Chairman of the Audit Committee shall then present the findings in writing to the Board of Directors, or a committee of the Board of Directors. The Board of Directors, or such committee, as applicable, will take further action to enforce the provisions of this Code.

128.    The statements referenced in ¶¶ 126-127 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the

Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

129.   On November 13, 2013, Altair issued a press release and filed a Form 8-K with the SEC ("11/13/13 Form 8-K"), signed by Defendant Conroy, announcing operating and financial results for the third quarter ended September 30, 2013.  Altair stated that it "reported revenues of $1.1 million for the third quarter compared to $0.4 million for the same period in 2012.  The gross loss was $0.1 million, due to a decline in warranty and inventory reserves of nearly $0.2 million, compared to $0.4 million for the same period in 2012.  Operating expenses were $3.7 million for the third quarter, a $0.3 million decrease from $4.0 million for the same period in 2012.  Cost cutting goals were achieved with planned reductions in the research and

development and sales and marketing departments. General and administrative costs increased due to the ramp up of the Company's China operations.  The net loss for the third quarter of 2013 was $3.7 million, or $0.32 per diluted share, compared to a net loss of $4.7 million, $0.40 per diluted share, for the same period in 2012."  And Altair stated that "cash and cash equivalents decreased by $9.1 million, from $12.4 million at December 31, 2012 to $3.3 million at September 30, 2013. The net decrease of $9.1 million resulted from the net decrease in operating activities of $7.6 million, the net decrease in investing activities of $11.7 million and the net increase in financing activities of $10.7 million."

130.    The statements referenced in ¶ 129 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not

detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

131.    On November 13, 2013, Altair hosted a conference call for investors and analysts to discuss the Company's third-quarter 2013 results ("11/13/13 Conference Call").  During the 11/13/13 Conference Call, Defendant R. Lee stated the following about Altair's financial and operational performance:

> Moving on to the last area of focus. We actively sort way to reduce costs. Prior to this quarter, the company has taken steps to reduce its cost. We are now seeing the benefits of these efforts. General and administrative cost in the U.S. has now stabilized. We will see some additional efficiency with the consolidation of the accounting and finance groups into the Anderson headquarter. With most manufacturing transferred to China and production poised to [indiscernible], cost efficiencies will soon be realized.

132.    The statements referenced in ¶ 131 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of

precision; (5) the Company did not implement adequate procedures and controls over the 2013

year-end financial close and reporting process to ensure timely filings in compliance with its

financial reporting requirements; (6) the Company did not implement adequate procedures and

controls to appropriately evaluate routine and non-routine transactions, and as a result, did not

detect the material misstatements that were identified by Crowe during its audit process; (7) the

Company did not implement adequate procedures and controls to ensure accurate and timely

communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company

did not implement adequate procedures and controls to ensure the completeness and accuracy of

its consolidated financial statements and related subsequent events.

133.    During the 11/13/13 Conference Call, Defendant Conroy stated the following

about Altair's financial performance:

> And with that, let me outline the results of the most recent quarter. For the third
> quarter ended September 30, 2013, revenues were $1.1 million, compared to the
> third quarter of 2012 revenues of $360,000. Gross loss was $74,000 in the third
> quarter of 2013, compared to $428,000 in the third quarter of 2012. Operating
> expenses were $3.6 million in the third quarter of 2013, compared to $4 million
> for the same period in 2012.
>
> The net loss for the second quarter of 2013 was $3.7 million or $0.32 a share,
> compared to the net loss of $4.7 million or $0.40 a share for the same period in
> 2012. The basic and diluted weighted average shares outstanding for the third
> quarter of 2013 remained constant at $11.6 million, compared to the same period
> of 2012. Revenues were increased by $772,000 in the third quarter of 2013,
> primarily due to increased battery cell sales to several customers.
>
> Gross loss was decreased by $354,000 in the third quarter of 2013, primarily due
> to a decline in warranty and inventory reserves of $140,000. Given the company's
> relatively low volume of sales and the changing product mix from quarter-to-
> quarter, margins are volatile until the volume increases, [indiscernible] caution.
> Operating expenses were decreased by $329,000 during the three months ended
> September 30, 2013, compared to the three months ended September 30, 2012.
> This decrease was primarily due to the planned reductions achieved in the U.S.,
> partially offset by the increases in headcount in our China operation as it begins to
> ramp up. Net loss was decreased by $926,000 in the third quarter of 2013,
> primarily due to the overall decrease in operating expenses and improved gross
> margin.

Altair's cash and cash equivalents decreased by $9.1 million from $12.4 million as of December 31, 2012 to $3.3 million as of December 30, 2013. The net decrease of $9.1 million resulted from the net decrease in operating activities of $7.6 million, the net decrease in investing activities of $11.7 million and the net increase in financing activities of $10.7million.

The investing activities included the acquisition of the second land use right from the Government of Wu'an, China, which was paid for by using restricted cash, and the purchase of fixed assets by Northern Altair. The financing activity included the increase of deferred income due to receiving $5.5 million in cash incentives from the purchase of the first land right use.

Our overall cash position, including restricted and long-term restricted classifications was $18.8 million as of June 30, 2013. We had submitted an application for cash incentives from the Government of Wu'an in an amount approximately equal to the amount of the second land use fee and related taxes of $8.6 million. We received $3.8 million in the third quarter and expect to receive the balance of the cash incentives from the Government of Wu'an in the fourth quarter of 2013.

134.   The statements referenced in ¶ 133 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and

controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

135.    On November 19, 2013, Altair filed a Form 10-Q with the SEC ("11/19/13 Form 10-Q"), which was signed by Defendants R. Lee and Conroy, reiterating the Company's quarterly financial results and financial position previously announced in the 11/13/13 Form 8-K.

136.    The statements referenced in ¶ 135 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and

controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

137.   The 11/19/13 Form 10-Q contained the following language about Altair's expanding operations in China:

> In 2012, we formed Altair Nanotechnologies (China) Co., Ltd. ("Altair China") and Northern Altair Nanotechnologies Co., Ltd. ("Northern Altair") in order to aggregate key elements of our supply chain and expand into the Chinese market. We anticipate this expansion will allow us to participate in the fast-growing China market.

138.   The statements referenced in ¶ 137 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (2) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; and (3) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing.

139.   The 11/19/13 Form 10-Q stated that Altair's principal executive officer and principal financial officer have concluded that its disclosure controls and procedures (as defined

in Rules 13a-15(e) or 15d-15(e) of the Exchange Act) were effective and that there had been no changes in the Company's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Exchange Act Rules 13a-15 or 15d-15, using language substantially similar to that used in the Q1 Form 10-Q, as reflected in ¶ 91 above.

140.    The statements referenced in ¶ 139 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company

did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

141.   The 11/19/13 Form 10-Q contained signed Rule 13a-14(a)/15d-14(a) Certifications by Defendants R. Lee and Conroy, using language substantially similar to that used in the Q1 Form 10-Q, as reflected in ¶ 93 above.

142.   The statements referenced in ¶ 141 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company

did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

143.     The 11/19/13 Form 10-Q contained signed Section 1350 Certifications by Defendants R. Lee and Conroy, using language substantially similar to that used in the Q1 Form 10-Q, as reflected in ¶ 94 above.

144.     The statements referenced in ¶ 143 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's financial information disclosed in 2013 could not be relied upon; (2) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (3) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; (4) the Company's significant executive management and accounting level turnover in 2013 resulted in a lack of segregation of duties throughout the Company and a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (5) the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (6) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process; (7) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and as a result of the foregoing, (8) the Company

64

did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

145.    On November 22, 2013, Altair filed a Form 8-K with the SEC ("11/22/13 Form 8-K"), which was signed by Defendant Conroy, disclosing the Company's material definitive financing agreements with the Bank of China Limited, Seoul Branch and Wuan Rural Credit Cooperative Co., Limited.  The 11/22/13 Form 8-K stated, in pertinent part, as follows:

**Item 1.01 Entry into Material Definitive Agreement**

The information set forth in Item 2.03 is incorporated into this Item 1.01 by reference.

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

On October 24, 2013, Altairnano, Inc., and the Bank of China Limited, Seoul Branch (the "Bank") entered into a series of agreements under which Northern Altair Nanotechnologies Co., Ltd ("Northern Altair") set aside restricted cash of approximately $4.0 million with the Bank of China supporting a letter of credit in favor of the Bank. In return, the Bank loaned the Company $3,800,000 which was received on November 12, 2013. The interest rate on this loan is three-month LIBOR plus 200 basis points, to be reset every three months, accrued interest is due at the end of each three-month period during the loan term. The maturity date is November 7, 2014.

On October 31, 2013, Northern Altair entered into, and closed, a financing under a Community Loan Contract (the "Agreement") and related documents with the Wuan Rural Credit Cooperative Co., Limited (the "Credit Coop") with respect to RMB 105,000,000 or approximately USD $17,115,700, loan. The interest rate on this loan is 12% and the maturity date is October 30, 2014. The loan is secured by Northern Altair's Land Use Right with respect to industrial land in Wu'an, China.

146.    The statements referenced in ¶ 145 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants

made false and/or misleading statements and/or failed to disclose that the processes used to approve these the material financing agreements were materially deficient.

147.    On January 23, 2014, Altair filed a Form 8-K with the SEC, which was signed by Defendant R. Lee, disclosing the Altair Board's approval of plans to consolidate U.S. manufacturing operations to Wu'an, China, stating, in pertinent part, as follows:

> On January 19, 2014, Altairnano, Inc. approved plans to consolidate all US manufacturing operations and transition manufacturing to Wu'an, China starting in the second quarter of 2014. We will retain engineering, research and development, sales and marketing, and support capabilities in the US. We are currently in the final planning phases of this initiative and the Company will roll out details to our customers in the near future.

148.    The statements referenced in ¶ 147 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was unable to timely, completely, and accurately disclose Altair's material transactions in China; (2) the Company had a debilitating lack of cohesion and communication between its Chinese and American operations; and (3) the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China.

149.    On March 24, 2014, the Company filed a Form 8-K with the SEC ("3/24/14 Form 8-K"), which was signed by Defendant Werner, announcing that the Altair Board at its meeting on March 18, 2014 appointed Defendant Sun to interim CEO and Defendant Werner to interim CFO.

150.    The statements referenced in ¶ 149 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's

business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that the processes used to appoint Defendants Sun and Werner were materially deficient.

### The Truth Slowly Emerges Along with Continued Materially False and Misleading Statements

151.    The truth was revealed through a series of partial disclosures.

152.    On August 30, 2013, Altair revealed that Defendant A. Lee resigned as the Company's CEO, and had been replaced by the Board with Defendant R. Lee.

153.    As a result of this news, Altair Common Stock fell from $2.43 per share at the close on August 29, 2013 to $2.36 per share at the close of August 30, 2013, or over 2.8%, on above-average volume.  Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

154.    On October 29, 2013, Altair disclosed that Defendant A. Lee had resigned as a director of the Altair Board.

155.    As a result of this news, Altair Common Stock fell from $4.82 per share at the close on October 29, 2013 to $4.66 per share at the close of October 30, 2013, or over 3.3%, on above-average volume.  Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

156.    On January 17, 2014 towards the end of trading, Altair revealed that Defendant Conroy had "resigned" as the Company's CFO and from positions with the Company's

subsidiaries.  As detailed above, however, FE2 and FE7 stated that she was in fact terminated for informing Altair's management that the Company was insolvent.

157.    As a result of this news towards the end of trading on January 17, 2014, Altair Common Stock fell from $5.39 per share at the close on January 16, 2014 to $5.05 per share at the close of January 21, 2014, or over 6.3%, on above-average volume.  Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

158.    On March 26, 2014, Altair filed a Form 8-K announcing that nonparty Al Yousuf's resigned from the Altair Board and its Audit Committee, effective March 20, 2014.  Al Yousuf resigned over disagreements detailed in his resignation letter dated March 20, 2014, sent to the Altair Board, and attached to the 3/26/14 Form 8-K.

159.    As a result of this news, which Altair disclosed relatively late in the trading day on March 26, 2014, Altair Common Stock fell from $5.08 per share at the close on March 25, 2014 to $4.28 per share at the close on March 27, 2014, or over 15.7%, on high trading volume.  Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

160.    On April 1, 2014, Altair filed a Form 12b-2 Notification of Late Filing with the SEC ("4/1/14 Form 12b-2"), which was signed by Defendant Werner, indicating that it would be unable to file its annual report for the 2013 fiscal year on Form 10-K in a timely manner.  Specifically, the Company stated the following:

> The filing deadline for the Annual Report on Form 10-K for the period ended December 31, 2013 (the "Report") for Altair Nanotechnologies Inc. (the

"Company") was March 31, 2014. The Company was unable to file the Report within the prescribed time period due to delays in completing the required consolidation under U.S. GAAP. The process of compiling and disseminating the information required to be included in the Report for the relevant periods, as well as the completion of the required review of its financial information, could not be completed without incurring undue hardship and expense.

161.    As a result of this news, which Altair filed with the SEC after the close of trading on April 1, 2014, Altair Common Stock fell from $4.70 per share at the close on April 1, 2014 to $4.55 per share at the close on April 2, 2014, or over 3.1%, on high trading volume.  Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

162.    Altair completed the 4/1/14 Form 12b-2 to disclose the following: the Company would file its annual report for the 2013 fiscal year on Form 10-K on or before the 15th calendar day following the prescribed due date; and it was not anticipated that any significant change in results of operations from the corresponding period for the last fiscal year would be reflected by the earnings statements to be included in the subject report or portion thereof.

163.    Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

164.    On April 23, 2014, Altair filed Form 8-K with the SEC ("4/23/14 Form 8-K"), which was signed by Defendant Werner, announcing that on April 16, 2014, The NASDAQ Stock Market ("NASDAQ") sent letters to the Company regarding its noncompliance with listing rules.  The 4/23/14 Form 8-k stated, in pertinent part, as follows:

On April 16, 2014, Altair Nanotechnologies Inc. (the "Company") received a letter from The NASDAQ Stock Market ("NASDAQ") indicating that the Company was not in compliance with the audit committee requirements in

NASDAQ Marketplace Rule 5605. Among other things, Rule 5605 requires that the Company have an audit committee composed of at least three independent directors. Eqbal Al Yousuf, a member of the Company's audit committee, was appointed to the Board of Directors and the Audit Committee on August 26, 2013 and resigned on March 20, 2014. According to the letter, pursuant to Rule 5605(c)(4), the Company has been provided a cure period in order to regain compliance, which cure period shall survive until the earlier of the Company's next annual shareholders meeting or March 20, 2015.

Other than directors who are already serving on the audit committee, none of the Company's existing directors satisfy the independence requirements associated with the audit committee. The Company is reviewing potential director candidates that it believes would be qualified to serve on the audit committee and expects to regain compliance as soon as practical, but in no event later than the deadline.

On April 16, 2014, the Company received a second letter from NASDAQ indicating that the Company was not in compliance with the continuous listing rules due to its failure to file its Annual Report on Form 10-K for the year ended December 31, 2013 (the "Annual Report") on a timely basis. Under the rules, the Company has 60 days to submit a plan to regain compliance and if the plan is accepted, the Company could be granted up to 180 calendar days from the Annual Report's due date, or until October 13, 2014, to regain compliance. The Company will also be added to NASDAQ's list of non-compliant companies.

The Company expects to file its Annual Report as soon as practical and expects to submit a plan to regain compliance within the timelines prescribed by the letter and NASDAQ rules.

165.    As a result of this news, Altair Common Stock fell from $4.02 per share at the close on April 22, 2014 to $3.97 per share at the close on April 23, 2014, or over 1.2%, on high trading volume.   Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

166.    On May 27, 2014, Altair filed a Form 8-K ("5/27/14 Form 8-K"), which was signed by Defendant Werner, announcing that on May 20, 2014, NASDAQ sent a letter to the Company regarding its noncompliance with listing rules.   The 5/27/14 Form 8-K stated, in pertinent part, as follows:

On May 20, 2014, the Company received a letter from the NASDAQ Stock Market ("NASDAQ") indicating that the Company was not in compliance with the continuous listing rules due to its failure to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2014 on a timely basis. Under the rules, the Company has until June 16, 2014 to submit a plan to regain compliance and if the plan is accepted, the Company could be granted up to 180 calendar days from the date of its initial filing delinquency, or until October 13, 2014, to regain compliance.

The Company expects to file its Annual Report for the year ended December 31, 2013 and Quarterly Report for the quarter ended March 31, 2014 as soon as practical and expects to submit a plan to regain compliance within the timelines prescribed by the letter and NASDAQ rules.

167.     As a result of this news, which Altair filed with the SEC after the close of trading on May 27, 2014, Altair Common Stock fell from $3.00 per share at the close on May 27, 2014 to $2.80 per share at the close on May 28, 2014, or over 6.6%, on high trading volume. Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

168.     On May 28, 2014, Marques Mendes & Associados Ltd through its Sadif Newsletter & Investment Management Portal published a Rating Update Report on Altair, based on data as of market close on May 28, 2014.  The report downgraded the stock to risky from average, stating that Altair "has weak business growth and is run by inefficient management."

169.     As a result of this news, which was based on data as of the close of trading on May 28, 2014, Altair Common Stock fell from $2.80 per share at the close on May 28, 2014 to $2.74 per share at the close on May 29, 2014, or over 2.1%, on high trading volume.  Defendants continued to conceal the fraud, including, without limitation, Altair's inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

170.    On August 19, 2014, Altair filed a Form 8-K with the SEC ("8/19/14 Form 8-K"), which was signed by Defendant Werner, disclosing that on August 18, 2014, NASDAQ sent a letter to the Company regarding its noncompliance with listing rules.  The 5/27/14 Form 8-K stated, in pertinent part, as follows:

> On August 18, 2014, Altair Nanotechnologies, Inc. (the "Company") received a letter from the NASDAQ Stock Market ("NASDAQ") indicating that the Company was not in compliance with continuous listing rule 5250(c)(1) due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2014. NASDAQ staff had previously granted the Company until July 31, 2014 to file its Annual Report on Form 10-K for the year ended December 31, 2013 (the "Form 10-K") and until September 30, 2014 to file its Quarterly Report on From 10-Q for the period ended March 31, 2014. The Company failed to file the Form 10-K within the extension period, and NASDAQ staff is evaluating an explanation and new timeline submitted by the Company.

171.    On September 4, 2014, Altair filed a Form 8-K with the SEC, which was signed by Defendant Werner, announcing that on August 28, 2014, Crowe resigned as the Company's independent registered public-accounting firm.  According to Altair, Crowe's resignation letter to the Company's management and the Audit Committee stated that Crowe was resigning because it was unable to complete its audit and issue an audit report for the year ended December 31, 2013 due to material weaknesses in the Company's controls and procedures.

172.    As a result of this disclosure, NASDAQ halted Altair's shares during the trading day on September 4, 2014 at $4.30 per share.  Defendants continued to conceal the fraud, including, without limitation, Altair's admission of its inadequate controls and procedures to ensure the completeness and accuracy of its SEC filings, so the price of Altair's Common Stock remained artificially inflated.

173.    On September 15, 2014, Altair filed a Form 8-K with the SEC, which was signed by Defendant Werner, disclosing that the Company notified NASDAQ that it is withdrawing the

listing of its Common Stock, $.001 par value, from the NASDAQ Stock Market, stating, in pertinent part, as follows:

> As required by Rule 12d2-2(c)(2) under the Exchange Act and NASDAQ Rule 5840(j), set forth below is a summary of material facts surrounding the Company's withdrawal notice.
>
> For the reasons described below, the Company has not filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2013, its Quarterly Report on Form 10-Q for the quarter ended March 31, 2014 or its Quarterly Report on Form 10-Q for the quarter ended June 30, 2014 (the "Financial Reports"). This represents non-compliance with NASDAQ Rule 5250(c)(1).
>
> The Company received notices from NASDAQ staff regarding its failure to file the Financial Reports, and the NASDAQ staff has previously given the Company a series of discretionary extensions to file the Financial Reports, with the most recent extension continuing until October 13, 2014. In the latest extension letter and related communications, NASDAQ staff indicated that the extension until October 13, 2014 represented the maximum extension the staff could grant.
>
> As the Company worked to try to file the Financial Reports prior to October 13, 2014, on August 28, 2014, Crowe Horwath LLP ("Crowe") resigned as the Company's independent registered public accounting firm. As previously reported by the Company, in its resignation letter, Crowe advised the Company that it was resigning due to its inability to complete the audit of the Company's financial statements for the year ended 2013 in part due its inability to perform sufficient procedures to determine the completeness of reporting of subsequent events transactions that may have occurred in China and in part due to the Company's material weakness relative to implementing controls and procedures to ensure accurate and timely communications between the Company's subsidiaries in China and its U.S.-based accounting team. Immediately prior to its resignation, Crowe sent a letter to management and the Audit Committee of the Company's Board of Directors identifying the following material weaknesses:
>
> - The Company experienced significant executive management and accounting level turnover in 2013 which led to a lack of segregation of duties throughout the Company and resulted in a lack of controls to perform a timely review of transactions at an appropriate level of precision.
>
> - The Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements.

- The Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Crowe during its audit process.

- The Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China, and as a result, led to material misstatements that were identified by Crowe during its audit process.

- The Company did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

Due to the recent resignation of the Company's independent public accountant and issues underlying such resignation, the Company does not believe it will be able to meet the October 13, 2014 deadline for filing the Financial Reports. The Company believes these same issues will lead to an inevitable delisting of the Common Stock by NASDAQ in the near future. Management of the Company is spending considerable time communicating with NASDAQ and believes that, as the NASDAQ staff moves to delist the Company, time and expense associated with attempts to remain on NASDAQ may increase. Based upon its belief that delisting of the Common Stock is inevitable and that continued or future appeals to NASDAQ for the purpose of seeking continued listing would prove futile, the Board of Directors of the Company determined that it would be prudent to voluntarily delist from NASDAQ in order that management may focus its energies on engaging a new auditor, completing the Financial Reports and managing the Company's business.

The Company expects to file the Financial Reports in the future and to continue to file periodic reports under the Exchange Act. The Company does not have in place alternative arrangements with respect to listing or quoting of its common stock. Trading on the OTC Pink Sheets or other market may commence in future as a result of filings or actions by market makers; however, the Company does not intend to take steps to facilitate trading or quotation on any market until it is current in its financial reporting.

174.    Shares of Altair resumed trading on September 24, 2014, and as a result of this news, immediately fell $3.35 per share, a drop of nearly 78% from the halted price of $4.30 on September 4, 2014, to close at $0.95 on September 24, 2014, on high trading volume. Defendants continued to conceal the fraud, including, without limitation, the fact that the

Company's financial statements for 2013 were materially misstated, so the price of Altair's Common Stock remained artificially inflated.

175.    On September 24, 2015, Altair filed a Form 25, which Defendant Werner signed, disclosing the notification of the Company's removal of its Common Stock from listing on NASDAQ.

176.    As a result of this news, which Altair filed with the SEC after the close of trading on September 24, 2015, Altair Common Stock fell from $0.95 per share at the close on September 24, 2014 to $0.75 per share at the close on September 25, 2014, or over 21%, on high trading volume.

177.    After delisting the Altair Common Stock from NASDAQ, Altair filed its 3/13/15 Form 8-K, which was signed by Defendant Zhan, admitting that as "a result of the management team's work, on March 13, 2015, the Company determined that there exists factual support that such issues and weaknesses [that Crowe raised in its letter filed in the 9/4/14 Form 8-K] existed in 2013 and has therefore determined that the financial statements for the three and nine month periods ended September 30, 2013, as presented on the Company's Form 10-Q that was filed with the [SEC] on November 19, 2013, should no longer be relied upon."

178.    Overall, in response to these disclosures during the Class Period, the Company's Common Stock plummeted over an aggregate 90%, from a closing of $7.99 on October 14, 2013 to a closing of $0.75 on September 25, 2014.

179.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Altair Common Stock, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

180.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Altair, their control over, and receipt or modification of the Company's allegedly materially misleading misstatements and their associations with the Company, which made them privy to confidential proprietary information concerning Altair, participated in the fraudulent scheme alleged herein.

## The Fraud Implicates the Core
## Operations

181.    The fraud alleged herein Altair's core operations.  The Company's financial performance, material transactions in China, cohesion between the Chinese and American businesses, retention of its upper-most echelon of executives, internal controls and procedures, and compliance with the U.S. federal securities laws and NASDAQ listing requirements  are at the heart of Altair's survival.

182.    In light of these facts, knowledge of the alleged improprieties and lack of internal controls is imputable to the Individual Defendants, given the implication of core operations and the Individual Defendants' roles and statuses within Altair.

## Defendants Signed or SOX Certified
## the Alleged Misstatements

183.    As the individuals who signed or were quoted in the alleged false and misleading statements described herein, the Individual Defendants were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully. As alleged herein, they violated such duties.

184.    As the individuals who SOX certified the SEC filings as described above, the Individual Defendants were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were

accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

**Key Executive Demotions,
Resignations, and Departures**

185.    Another indicator of scienter is the removal of key executives during or shortly after the Class Period.  Such demotions, resignations, and departures, which were highly suspect in timing, strongly support the scienter inference, most of which occurred at the height of the fraud alleged herein, included those alleged above in ¶¶ 63-70.

**Altair's History of Missing SEC
Filing Deadlines**

186.    Altair's history of missing filing deadlines with the SEC should have put the Individual Defendants on heightened alert about the failure of the Company's internal controls and procedures.

187.    Altair disclosed the following about the Company's history of filing late reports with the SEC in its 10/25/13 Proxy:

> Section 16(a) of the Exchange Act requires the Company's officers, directors and persons who own more than 10% of the Company's common stock to file reports concerning their ownership of common stock with the SEC and to furnish the Company with copies of such reports. Based solely upon the Company's review of the reports required by Section 16 and amendments thereto furnished to the Company, the Company believes that all reports required to be filed pursuant to Section 16(a) of the Exchange Act during 2011 were filed with the SEC on a timely basis, except for the following:

> (1) A Form 3 which was filed by Albert Zou approximately one and one half months after its due date;

> (2) a Form 3, which was filed by Jun Liu approximately one and one half months after its due date;

> (3) a Form 3, which was filed by Yingcang Wei approximately one and one half months after its due date;

(4) a Form 3, which was filed by Simon Xue approximately one and one half months after its due date;

(5) a Form 3, which was filed by Sun Guohua approximately one and one half months after its due date;

(6) a Form 3, which was filed by Zhigang Zhao approximately one and one half months after its due date;

(7) a Form 4 reporting one transaction in the Company's common stock, which was filed by Stephen B. Huang approximately six days after its due date;

(8) a Form 3, which was filed by Energy Storage (China) approximately two months after its due date;

(9) a Form 4 reporting one transaction in the Company's common stock, which was filed by H. Frank Gibbard approximately seven days after its due date;

(10) a Form 3, which was filed by Guo Hong approximately twenty-four days after its due date; and

(11) a Form 4, which was filed by Stephen A. Balogh approximately three days after its due date.

### Unique Positions Within Altair

188.    The Individual Defendants who were members of the (i) Altair Board, including Defendants Sun, Zhan, and Wei, (ii) Audit Committee, including Defendant A. Lee, or (iii) Compensation, Nominating and Governance Committee, including Defendants Sun and Wei, had duties to pay special attention to the Company's financial statements, material transactions in China, cohesion between the Chinese and American businesses, exodus of the upper-most echelons of the Company's executives, internal controls and procedures, and compliance with the U.S. federal securities laws and NASDAQ listing requirements.  These special duties arose from mandates of each of the Altair Board, Audit Committee, and Compensation, Nominating and Governance Committee.

189.    Altair's Mandate of the Board of Directors stated, in pertinent part, as follows:

**Mandate**

The Board of Directors (the "Board") of Altair Nanotechnologies Inc. (the "Company") will oversee the governance of the Company's business.

Directors shall exercise their judgment in a manner consistent with their fiduciary duties. In particular, directors are required to act honestly and in good faith, with a view to the best interests of the Company and its shareholders and to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

### Responsibilities

The Board discharges its responsibilities directly, through delegation to committees of the Board and, as appropriate, through delegation to individual directors.

The Board's responsibilities, to be discharged directly, through delegation to committees of the Board and, as appropriate, through delegation to individual directors shall include:

### Oversight of Management

- Participating in the selection, appointment, development, evaluation and compensation of the Chief Executive Officer ("CEO") and other senior officers directly and through the Compensation and Nominating Committee.

- Promoting, by the actions of the Board and its individual directors, a culture of integrity throughout the Company, consistent with the Company's Code of Conduct and Code of Ethics. By the Board's oversight of senior officers, the Board will encourage the CEO and other executive officers to act with integrity and to create a culture of integrity throughout the Company.

- Periodically reviewing the Company's Code of Conduct and Code of Ethics and making changes as appropriate.

### Financial and Risk Matters

- Overseeing the reliability and integrity of the financial statements and other publicly reported financial information, and of the disclosure principles and practices followed by management.

- Overseeing the integrity of the Company's internal controls and management information.

- Reviewing and approving an annual operating budget for the Company and its subsidiaries on a consolidated basis and monitoring the Company's performance against such budget.

- Reviewing and approving quarterly financial statements and the release thereof by management.

- Overseeing the Company's controls and procedures for the preparation and dissemination of current reports and news releases in an effort to ensure that material information is disseminated in a timely and accurate fashion.

- Periodically assessing the processes utilized by management with respect to risk assessment and risk management, including the identification by management of the principal risks of the business of the Company, and the implementation by management of appropriate systems to deal with such risks.

190.  Altair's Audit Committee Charter stated, in pertinent part, as follows:

**I. COMMITTEE'S PURPOSE**

The Audit Committee ("Committee") is appointed by the Board of Directors ("Board") to assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) compliance by the Company with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, (4) performance of the Company's internal and independent public accounting firm, and (5) the business practices and ethical standards of the Company. The Committee is also directly responsible for (a) the appointment, compensation, retention and oversight of the work of the Company's independent public accounting firm, and (b) the preparation of the report that the Securities and Exchange Commission ("Commission") requires to be included in the Company's annual proxy statement. While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are presented fairly in all material respects in accordance with generally accepted accounting principles. These are the responsibility of management and the independent auditor.

*     *     *

**V. AUTHORITY AND RESPONSIBILITY OF THE COMMITTEE**

The Audit Committee shall have the authority (1) to exercise all powers with respect to the appointment, compensation, retention and oversight of the work of the independent auditor for the Company and its subsidiaries, (2) to retain special legal, accounting or other consultants to advise the Committee and to pay the fees of such advisors and (3) to determine the amount of funds it needs to operate and direct the CFO make such funds available. As part of its oversight role, the Committee may investigate any matter brought to its attention, with the full power to retain outside counsel or other experts for this purpose. Unless special circumstances require the fact or terms of any engagement or appointment made by the Committee to be kept confidential from the Chief Financial Officer, the

Committee shall promptly notify the Chief Financial Officer of the fact and terms of any appointment or engagement, and provide copies of related agreements, and shall cause all invoices to be forwarded to or at the direction of the Chief Financial Officer promptly following receipt. Confidential portions of any agreement or invoice may be redacted. The Audit Committee may request any officer of employee of the Company or the Company's outside counsel or independent auditor to attend a meeting of the Committee or to meet with any member of, or consultant to, the Committee. Without limiting the generality of the foregoing, the Audit Committee shall:

*Financial Statements and Disclosure Matters*

1. Review and discuss prior to public dissemination the annual audited and quarterly unaudited financial statements with management and the independent auditor, including major issues regarding accounting, disclosure and auditing procedures and practices as well as the adequacy of internal controls that could materially affect the Company's financial statements. In addition, the review shall include the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." Based on the annual review, the Audit Committee shall recommend inclusion of the financial statements in the Annual Report on Form 10-K to the Board.

2. Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

3. Review and discuss reports from the independent public accounting firm on:

   A. Critical accounting policies and practices to be used.

   B. Alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramification of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

   C. Other material written communications between the independent auditor and management, such as any management letter.

4. Discuss with management the Company's earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally consisting of discussing the types of information to be disclosed and the types of presentations to be made. In its discretion, the Committee may adopt policies requiring specific reviews and approvals with respect to press releases, SEC reports and other disclosures, whether or not financial in nature.

5. Discuss with management and the independent auditor the effect on the Company's financial statements of significant regulatory and accounting initiatives as well as off-balance sheet structures.

6. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

7. Review with the independent auditor any audit problems or difficulties and management responses, including but not limited to (1) any restrictions on the scope of the auditor's activities, (2) any restrictions on the access of the independent auditor to requested material, (3) any significant disagreements with management and (4) any audit differences that were noted or proposed by the auditor but for which the Company's financial statements were not adjusted (as immaterial or otherwise). The Committee will resolve any disagreements between the auditors and management regarding financial reporting.

8. Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of disclosure controls and procedures and internal controls over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal controls.

9. Discuss at least annually with the independent auditor the matters required to be discussed by Statement of Auditing Standards No. 61 - Communication with Audit Committees.

10. Prepare the Audit Committee report that the Commission requires to be included in the Company's annual proxy statement and review the matters described in such report.

11. Obtain from management the annual report on internal controls over financial reporting required by governing rules, as well as the independent auditor's attestation report on management's assessment of internal controls over financial reporting.

*Responsibility For The Company's Relationship With The Independent Auditor*

12. Be solely responsible for the appointment, compensation, retention and oversight of the work of the independent public accounting firm employed by the Company. The independent auditor shall report directly to the Audit Committee. If the appointment of the independent public accounting firm is submitted for any ratification by stockholders, the Audit Committee shall be responsible for making the recommendation of the independent public accounting firm.

13. Review, at least annually, the qualifications, performance and independence of the independent auditor. In conducting such review, the Committee shall obtain

and review a report by the independent auditor describing (1) the firm's internal quality-control procedures, (2) any material issues raised by the most recent internal quality control review, or peer review, of the firm or by any formal investigation by governmental or professional authorities regarding services provided by the firm which could affect the financial statements of the Company, and any steps taken to deal with any such issues, and (3) all relationships between the independent auditor and the Company that could be considered to bear on the auditor's independence. This evaluation shall include the review and evaluation of the lead partner of the independent auditor and shall ensure the rotation of partners in accordance with Commission rules and the securities laws. In addition, the Committee shall consider the advisability of regularly rotating the audit firm in order to maintain the independence between the independent auditor and the Company.

14. Approve in advance any audit or permissible non-audit engagement or relationship between the Company and the independent public accounting firm. The Committee shall establish guidelines for the retention of the independent auditor for any permissible non-audit services. The Committee hereby delegates to the Chairman of the Committee the authority to approve in advance all audit or non-audit services to be provided by the independent auditor if presented to the full Committee at the next regularly scheduled meeting.

15. Meet with the independent auditor prior to the audit to review the planning and staffing of the audit including the responsibilities and staffing of the Company's internal audit department personnel who will assist in the audit.

16. Recommend to the Board policies for the Company's hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company.

17. Ensure its receipt from the independent public accounting firm of a formal written statement delineating all relationships between the auditor and the company, consistent with Independence Standards Board Standard 1, engage in a dialogue with the auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the auditor and take, or recommend that the Board take, appropriate action to oversee the independence of the outside auditor.

*Oversight Of The Company's Internal Audit Function*

18. Review the appointment and replacement of the senior internal auditing executive or functional outside equivalent.

19. Review the activities and organizational structure of the internal auditing function and the significant reports to management prepared by the internal auditing department and management's responses.

20. Discuss with the independent auditor and management the internal audit function responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit department.

21. Obtain from the independent auditor assurance that Section 10A (b) of the Securities Exchange Act of 1934, as amended, has not been implicated.

22. Obtain reports from management and the Company's internal auditing function that the Company is in conformity with applicable legal requirements and the Company's Code of Conduct and its Code of Ethics for Senior Executives, Financial Officers and Members of the Management Executive Committee (the "Codes"). Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Codes.

23. Establish and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls or auditing matters. Also, the Committee shall maintain the Anonymous Reporting Hotline for the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting, internal controls or auditing matters.

24. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

*25.* Review at least annually legal matters with the Company's General Counsel that may have a material impact on the financial statements, the Company's compliance policies, including but not limited to the Foreign Corrupt Practices Act, and any material reports or inquires received from regulators or governmental agencies.

*     *     *

*Other*

27. Report regularly to the Board with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent public accounting firm or the performance of the internal audit function.

191.    Altair's Compensation, Nominating and Governance Committee Charter stated, in

pertinent part, as follows:

**COMMITTEE'S PURPOSE**

The Compensation, Governance and Nominating Committee (the "Committee") is appointed by Board of Directors (the "Board") of Altair Nanotechnologies ("Company") to discharge the Board's responsibilities relating to compensation of the Company's directors and officers, to oversee and monitor the Company's management in the interest and for the benefit of the Company's stockholders and assist the board by identifying individuals qualified to become board members. The Committee has overall responsibility for approving and evaluating the director and officer compensation plans, policies and programs of the Company. The Committee is also responsible for producing an annual report on executive compensation for inclusion in the Company's proxy statement.

*     *     *

## COMMITTEE AUTHORITY AND RESPONSIBILITIES RELATED TO COMPENSATION MATTERS

1. The Committee shall have the authority to retain and terminate any legal counsel or compensation or other consultant to be used to assist in the evaluation of director or executive compensation and shall have authority to approve the consultant's fees and other retention terms. The Committee shall also have authority to obtain advice and assistance from internal or external legal, accounting or other advisors and the authority to approve the payment of the advisor's fees and other retention terms. Unless special circumstances require the fact or terms of any such engagement or appointment to be kept confidential from the Chief Financial Officer, the Committee shall promptly notify the Chief Financial Officer of the fact and terms of any such appointment or engagement, and provide copies of related agreement, and shall cause all invoices to be forwarded to or at the direction of the Chief Financial Officer promptly following receipt. Confidential portions of any agreement or invoice may be redacted. All fees and other retention items for compensation consultants, internal or external legal, accounting or other advisors shall be paid by the Company.

2. *Chairman and/or the Chief Executive Officer.* The Committee shall set corporate goals and objectives relevant to the Chief Executive Officer's compensation. In determining each of the compensation elements (base salary and incentive bonus) of the Chief Executive Officer compensation, the Committee should consider the Company's performance and relative stockholder return, the value of similar incentive awards to chief executive officers at comparable companies, and the awards given to the Company's Chief Executive Officer in past years. The Committee shall annually review and evaluate, including a written evaluation to be included in the annual proxy statement, the Chief Executive Officer's performance in light of those goals and objectives. The Committee will have the authority, subject to the authority of the Board, to approve, amend, or terminate for the Chief Executive Officer of the Company the following compensation levels based on this evaluation: (a) annual base salary level, (b) annual incentive opportunity level, (c) long-term incentive opportunity level, (d) employment agreements or severance arrangements, and (e) any special or

supplemental benefits except as provided in Paragraph 6 of this Charter. The Chief Executive Officer may not be present during deliberations or voting regarding his compensation.

3. *Other Executives.* The Committee shall set corporate goals and objectives relevant to the Chief Financial Officer's compensation and that of other executive of the Company, in collaboration or consultation with the CEO. The Committee shall annually review and evaluate, including a written evaluation to be included in the Company's proxy statement, the Chief Financial Officer's performance in light of those goals and objectives. The Committee shall annually review and will have the authority, subject to the authority of the Board, to approve, amend or terminate for the executives of the Company, other than the Chief Executive Officer, (a) the annual base salary level, (b) the annual incentive opportunity level, (c) the long-term incentive opportunity level, (d) employment agreements or severance arrangements, and (e) any special or supplemental benefits except as provided in Paragraph 6 below.

4. *Directors.* The Committee will have the authority to approve, amend or terminate for directors (a) the annual compensation, and (b) any additional compensation for service on committees of the Board, service as a committee chairman, meeting fees or any other benefit payable by virtue of the director's position as a member of the Board of Directors, except as provided in Paragraph 6 below.

### Unique Experiences and Qualifications

192.    The unique experiences and qualifications of the Individual Defendants also enabled them to be on heightened alert for the Company's financial statements, material transactions in China, cohesion between the Chinese and American businesses, exodus of the upper-most echelons of the Company's executives, internal controls and procedures, and compliance with the U.S. federal securities laws and NASDAQ listing requirements

193.    Altair disclosed the following about Defendant A. Lee's qualifications to serve on the Altair Audit Committee in its 10/25/13 Proxy:

> The Board has determined in its business judgment that each member of the Audit Committee satisfies the requirements with respect to financial literacy set forth in NASDAQ Marketplace Rule 4350(d)(2)(A)(iv); … that each member of the Audit Committee, with the exception of Alexander Lee as described above, is independent under Rule 10A-3(b)(1)(ii) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act") and are, as a result of

their past employment experience in finance or accounting, requisite professional certification in accounting or other comparable experience or background, sophisticated with respect to financial matters.

The Audit Committee's responsibility is to assist the Board in its oversight of (a) the quality and integrity of the Company's financial reports, (b) the independence and qualifications of the Company's independent auditor, and (c) the compliance by the Company with legal and regulatory requirements. Management of the Company has the responsibility for the Company's financial statements as well as the Company's financial reporting process, principles and internal controls. The Company's independent public accounting firm is responsible for performing an audit of the Company's financial statements and expressing an opinion as to the conformity of such financial statements with accounting principles generally accepted in the United States of America.

194.   Altair disclosed the following about Defendant R. Lee's experiences and qualifications in its Form DEF 14A filed on October 25, 2013 ("10/25/13 Proxy"):

*[Experience]*

Mr. Lee was appointed as chief executive officer of the Company in August 2013. Prior to joining the Company, Mr. Lee recently served as managing director of DCM Management Consulting Ltd., a Hong Kong based consulting firm advising with respect to sales, business and credit reports. While at DCM, Mr. Lee acted as senior advisor to Zhuhai Yintong Group with respect to electric power train and lithium battery sales. Prior to joining DCM in 2010, Mr. Lee was vice president of Green Wheel EV Ltd./Thunder Sky Energy Group, a company engaged in the sales and marketing of electric vehicles and lithium batteries from 2007 to 2010, and vice chairman/managing director of CNT BioEnergy Ltd., a company engaged in the research and development of biofuels in China from 2001 to 2007. Mr. Lee served as chief executive officer of First Oriental Ltd., a company engaged in China trade business from 1996 to 2001, and chief executive officer of Gilman Engineering Ltd., an engineering contracting business from 1990 to 1995.

Mr. Lee has earned a Diploma in Production Engineering from Hong Kong Polytechnic University, an Advanced Diploma in Industrial Engineering from South Bank University, London, UK, and a Diploma in Management Studies from Westminster University, London, UK, and an MBA from Cranfield University, Bedford, UK. Diplomas are the result of one year graduate programs and were common in the United Kingdom before the 1970s.

*[Specific Qualifications]*

Mr. Lee is being nominated due to his prior experience in the rechargeable battery and electric vehicle industry, his general business knowledge and experience and

his company-specific knowledge arising from his service as chief executive officer of the Company.

195.   Altair disclosed the following about Defendant Sun's experiences and qualifications in its 10/25/13 Proxy:

*[Experience]*

Mr. Sun has served as the general manager of Canon Investment Holdings Limited and Guangdong Yintong Investment Holdings Group Co., Ltd. from April 2005 to the present and currently serves as a director of Zhuhai Yintong Energy Company Ltd. Prior to that, Mr. Sun served as General Manager of Beijing Yinda Transportation Investment Limited from 2003 to 2005, prior to that time, as vice general manager from 2001 to 2003. Mr. Sun also served as vice general manager of Nan-Ming-He Iron Ore Limited from 2001 to 2003.

Mr. Sun graduated with a degree in business administration from Handan University and with a master's degree in business administration from the University of Wales.

*[Specific Qualifications]*

Mr. Sun was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon. Pursuant to the covenant, the Board of the Company is required, except where legal or fiduciary duties would require otherwise, to appoint a number of directors nominated by Canon representing a majority of the Board.

196.   Altair disclosed the following about Defendant Conroy's experiences in its 10/25/13 Proxy:

Ms. Conroy most recently served as the managing member of Blue Bar Consulting, LLC, and a U.S. based consulting firm providing senior financial consulting and transitional CFO services from 2010 to present. Prior to being a managing member of Blue Bar Consulting in 2010, Ms. Conroy served as senior managing consultant of BKD LLP, specializing in merger and acquisition due diligence to private equity and strategic corporate acquirers from 2008 to 2010, and chief financial officer of RCS Management Corporation, a company engaged in the distribution of oxygen and respiratory products from 2007 to 2008. Ms. Conroy served as senior vice president and chief financial officer of Windrose Medical Properties Trust, a publicly-traded investment trust (REIT) for specialty medical real estate from 2006 to 2007, and director of finance and Corporate Accounts Operations of Roche Diagnostics, U.S., the U.S. diagnostic headquarters of the Swiss pharmaceutical company Roche Holdings, AG, from

2002 to 2006. Ms. Conroy began her career with Ernst & Young LLP in 1983 and held several positions until her resignation in 2002.

Ms. Conroy holds a Certified Public Accountant certificate (CPA) and has a Masters in Business Administration from Purdue University and a Bachelor of Science in General Management with an Accounting option from Purdue University. Ms. Conroy also lectures at Purdue University.

197.    Altair disclosed the following about Defendant Werner's experiences in the

3/24/14 Form 8-K:

Karen Werner is age 58 and has been promoted to Interim CFO. Ms. Werner served as Corporate Senior Assistant Controller of the Company from February 2012 to January 2014. Ms. Werner served as Corporate Controller for Windspire Energy, Inc. during 2011 and as Controller for Winkel Motors, Inc. from January 2008 to February 2011. Ms. Werner brings over 24 years of corporate and global experience in financial and compliance reporting and internal management accounting. Ms. Werner's experience has come from the renewable energy, manufacturing, financial, automotive, software development, foreign imports, sales, engineering and consulting industries. Ms. Werner has public and private company experience and holds a bachelor of science degree in business administration with honors from the University of Phoenix.

198.    Altair disclosed the following about Defendant Zhan's experience in the 8/19/14

Form 8-K:

Prior to joining the Company, beginning in May 2013, Mr. Zhan served as the General Manager for Chinese Institutional Client for Sun Hung Kai Financial, a China based financial advisory firm. From October 2009 to May 2012, Mr. Zhan was Head of China Coverage and Co-Chairman of China Business Committee for Mizuho Securities Asia, a large Japanese financial institution. Mr. Zhan served as an independent financial consultant from January 2009 to September 2009 and served as a Director at Deutsche Securities Asia from February 2008 to January 2009. From January 2007 to March 2008, Mr. Zhan was a Vice President with JPMorgan Chase Securities Asia. From April 2004 to January 2007, Mr. Zhan was a Vice President of Merrill Lynch Investment Managers, and from June 2000 to April 2004, Mr. Zhan was an Associate with Global Investment Bank, JPMorgan Chase & Co.

Mr. Zhan earned an M.B.A. in Finance and Corporate Accounting, University of Rochester, New York, an M.S. in Engineering, Louisiana Tech University, Ruston, Louisiana, and a B.S. in Mechanics (Applied Mathematics) from Beijing University, China.

199.    Altair disclosed the following about Defendant Wei's experiences in its 10/25/13

Proxy:

**[Experience]**

Mr. Yincang Wei has served as the chairman of Canon Investment Holdings Limited, Zhuhai Yintong Energy Company Ltd. and Guangdong Yingtong Investment Holdings Group Co., Ltd. from 2004 until the present time. Prior to that, Mr. Wei served as the chairman of Nan-Ming-He Iron Ore Limited, a company engaged in the business of iron mine operations. Mr. Wei also previously served in various senior management positions at Hebei Yinda Transportation Industrial Group, Hong Kong Dalong Investment Holdings Limited, Transportation Industrial Group Corporation, and Transportation Safety Equipment Factory.

Mr. Wei graduated from Xi'an Highway University with a degree in engineering. Mr. Wei has also pursued further education in Transportation Management and Vehicle Inspection and Testing at Xi'an Highway University.

**[Specific Qualifications]**

Mr. Wei was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon Investment holdings Limited ("Canon"). Pursuant to the covenant, the Board of the Company is required, except where legal or fiduciary duties would require otherwise, to appoint a number of directors nominated by Canon representing a majority of the Board.

## Corporate Scienter

200.    Finally, at a minimum, Plaintiff has alleged corporate scienter as to Altair as an

entity.   Corporate scienter may be alleged independent of individual defendants, where a

statement would have been approved by corporate officials sufficiently knowledgeable about the

company to know that the statement was false.   Here, the statements alleged were made to the

investing public regarding the Company's financial health, operations, business practices, and

compliance with NASDAQ listing requirements—all important topics that would necessarily

require approval by appropriate corporate officers who, as alleged, had very different

information in their hands at the time.

## NO SAFE HARBOR

201.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Altair who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

202.    The market for Altair shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Altair shares and operated as a fraud or deceit on Class Period purchasers of Altair shares by misrepresenting the material facts detailed herein.  As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Altair shares fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of Altair shares during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

203.    During the Class Period, Defendants presented a misleading picture of Altair's financial condition, revenues, growth, performance, and business prospects.  Defendants' false and misleading statements had the intended effect and caused Altair shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

204.    In response to the truth revelations, the price of Altair shares dropped dramatically on high volume, as detailed herein.  These drops, among others, removed inflation from the price of Altair shares, causing real economic loss to investors who had purchased Altair shares during the Class Period.

205.    The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Altair shares negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

206.    The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Altair's share price and the subsequent significant decline in the value of Altair shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## RELIANCE PRESUMPTION

207.    At all relevant times, the market for Altair shares was an efficient market for the following reasons, among others:

a.    For most of the Class Period, Altair met the requirements for listing, was listed, and actively traded on the NASDAQ under ticker symbol "ALTI", a highly efficient and automated market;

92

b.      During the Class Period, numerous shares of Altair stock were traded on a daily basis, demonstrating an active and broad market for Altair stock and permitting a strong presumption of an efficient market;

(c)      As a regulated issuer, Altair filed periodic public reports with the SEC;

(d)      Altair regularly communicated with public investors through established market-communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)      Altair was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)      Unexpected material news about Altair was rapidly reflected and incorporated into Altair's stock price during the Class Period.

208.    As a result of the foregoing, the market for Altair common stock promptly digested current information regarding Altair from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Altair common stock during the Class Period suffered similar injury through their purchase of Altair common stock at artificially inflated prices, and a presumption of reliance applies.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

209.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Altair securities traded on the NASDAQ during the Class Period (the

"Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

210.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Altair securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Altair or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.   Plaintiff's claims are typical of the claims of Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

212.   Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

213.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are the following:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the

Class Period misrepresented material facts about the business, operations, and management of Altair;

- whether the Individual Defendants caused Altair to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Altair securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the Class members have sustained damages and, if so, what is the proper measure of damages.

214. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

215. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Altair securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a

reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and Class members purchased and/or sold Altair securities between the time that the Defendants failed to disclose or misrepresented material facts and the time that the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

216.    Based upon the foregoing, Plaintiff and the Class members are entitled to a presumption of reliance upon the integrity of the market.

217.    Alternatively, Plaintiffs and Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Altair, A. Lee, R. Lee, Sun, Zhan, Huang, Conroy, and Werner

218.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

219.    This Count is asserted against Altair, A. Lee, R. Lee, Sun, Zhan, Huang, Conroy, and Werner ("Section 10(b) Defendants") and is based upon Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

220.    During the Class Period, the Section 10(b) Defendants did the following: engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed

devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to and, throughout the Class Period, did the following: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Altair securities; and (iii) cause Plaintiff and other Class members to purchase or otherwise acquire Altair securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants, individually and as a group, took the actions set forth herein.

221.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Section 10(b) Defendants, individually and in concert, participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Altair securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Altair's finances and business prospects.

222.    By virtue of their positions at Altair, the individual Section 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other Class members or, in the alternative, the individual Section 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Section 10(b) Defendants. Said acts and omissions of the Section 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Section

10(b) Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

223.   The Section 10(b) Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Altair securities from their personal portfolios.

224.   Information showing that the Section 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Section 10(b) Defendants' knowledge and control.   As the senior managers and/or directors of Altair, the individual Section 10(b) Defendants had knowledge of the details of Altair's internal affairs.

225.   The Section 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the individual Section 10(b) Defendants were able to and did, directly or indirectly, control the content of the statements of Altair.  As officers and/or directors of a publicly held company, the individual Section 10(b) Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Altair's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price for Altair's securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Altair's business and financial condition that were concealed by the Section 10(b) Defendants, Plaintiff and the other Class members purchased or otherwise acquired Altair securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Section 10(b) Defendants, and they were damaged upon the revelation of the alleged corrective disclosures.

226.     During the Class Period, Altair's securities were traded on an active and efficient market.  Plaintiff and the other Class members, relying on the materially false and misleading statements described herein that the Section 10(b) Defendants made, issued, or caused to be disseminated or relying upon the integrity of the market, purchased or otherwise acquired shares of Altair securities at prices artificially inflated by the Section 10(b) Defendants' wrongful conduct.  Had Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said securities, or they would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the other Class members, the true value of Altair securities was substantially lower than the prices paid by Plaintiff and the other Class members.  The market price of Altair's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and the other Class members.

227.     By reason of the conduct alleged herein, the Section 10(b) Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

228.     As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

229.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

230.    This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act (15 U.S.C. §78t(a)).

231.    During the Class Period, the Individual Defendants participated in the operation and management of Altair, and they conducted and participated, directly and indirectly, in the conduct of Altair's business affairs.  Because of their senior positions, they knew the adverse, non-public information regarding Altair's business practices.

232.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Altair's financial condition and results of operations and to correct promptly any public statements issued by Altair that had become materially false or misleading.

233.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Altair disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Altair to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of Altair within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of Altair securities.

234.    Each of the Individual Defendants, therefore, acted as a controlling person of Altair.  By reason of their senior management positions and/or being directors of Altair, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Altair to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Altair and possessed the power to control the specific activities that comprise the primary violations about which Plaintiff and the other Class members complain.

235.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Altair.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiff as the Class representative and their choice of counsel, lead counsel, as Class counsel;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 21,  2015

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Justin Solomon Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
           jnematzadeh@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com


*Attorneys for Lead Plaintiff*